HOME BUILDERS ASSOCIATION OF
METROPOLITAN DENVER,
Petitioner-Appellee,

v.

PUBLIC UTILITIES COMMISSION OF
the STATE OF COLORADO and Public
Service Company of Colorado, Respon-
dents-Appellants.

No. 84SA244.

Supreme Court of Colorado,
En Banc.

June 2, 1986.

Rehearings Denied June 23, 1986.

Rothgerber, Appel & Powers, James M. Lyons, Denver, for petitioner-appellee.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., John E. Archibold, Asst. Atty. Gen., Denver, for respondent-appellant, Public Utilities Com'n of Colo.

Kelly, Stansfield & O'Donnell, James K. Tarpey, Denver, for respondent-appellant, Public Service Co. of Colo.

QUINN, Chief Justice.

The Public Utilities Commission (PUC) and Public Service Company of Colorado (Public Service) appeal from a judgment of the Denver District Court, which set aside and decreed null and void a decision of the PUC establishing an embedded investment method for calculating a free construction allowance in connection with the construction of electrical distribution facilities, service laterals, and street lights.[1] The district court held that the PUC acted in a rule-making, as opposed to adjudicatory, capacity without complying with the procedural requirements applicable to a rule-making proceeding as mandated by the State Administrative Procedure Act, §§ 24-4-101 to -108, 10 C.R.S. (1982 & 1985 Supp.), and the Colorado Public Utilities Law, §§ 40-6-101 to -121, 17 C.R.S. (1984 & 1985 Supp.). We conclude that the PUC failed to follow the legislative requirements for rule-making in adopting the embedded investment formula for calculating free construction allowances and that it adopted a formula which was not supported by substantial evidence. We affirm, therefore, the judgment of the district court.

I.

On February 28, 1980, Public Service filed Application No. 32602[2] with the PUC, in which it sought to change Public Service's electric distribution extension policy, particularly with respect to the amount of money customers would be required to

---

1. Appellate review of district court decisions affirming, setting aside, or modifying any decision of the commission lies in the supreme court. § 40-6-115(5), 17 C.R.S. (1984).

2. Public Service also filed Application No. 32845 requesting changes in its charges for installing gas and electric meters. This application was consolidated for hearing with the application to change the free construction allowance. Judicial review of Application No. 32845, however, was not sought, and the district court order did not nullify the PUC decision as it related to Application No. 32845. In discussing the recommended decision of the examiner and the decision of the commission throughout the opinion, therefore, we refer only to those portions of the decisions relevant to the application concerning the free construction allowance.

deposit with Public Service in connection with the construction of electric distribution facilities, service laterals, and street lights. The purpose of an extension policy is to allocate the cost of extending existing facilities to new customers by setting forth the amount to be paid by the customer, which is denominated "customer advance" by the PUC, and the amount to be paid or invested by the utility, which is denominated "free construction allowance."

The PUC has adopted rules regulating the service of electric utilities. Rule 31, § II(c), 4 C.C.R. 723-3 (1977), contains the requirements for extending permanent service, lines, and facilities and provides as follows:

> Each [public utilities'] extension policy [for permanent service] shall specifically set forth the relation that the investment the utility is justified in making for an extension bears to the said assured monthly or annual revenue. This relation shall be expressed as the extension percentage of said revenue to said investment, or as the extension ratio of said investment to said revenue; in urban territory this relation may be limited by a fixed minimum amount of construction to be provided by the utility. A utility may adopt separate ratios of investment to revenue for different territories and conditions of service.[3]

Prior to submitting its application, Public Service's free construction allowance for a new customer was 5.5 times the estimated annual gross revenue. For example, if it was estimated that the customer would generate $100 total revenue per year, then the free construction allowance would equal 5.5 times $100, or $550. Public Service, therefore, would install at its expense electric distribution facilities equal to 5.5 times the average revenue to be received from the new customer, or $550, and the customer would pay all estimated costs in excess of $550. Public Service sought in its application to revise the free construction allowance downward to one times the annual base rate revenue.[4] In effect, Public Service proposed to install the necessary electric distribution facilities equivalent in cost to one times the estimated average annual base rate revenue to be received

---

3. Public Service has different extension policies for temporary and indeterminate service. Temporary service refers to service supplied to enterprises such as fairs, bazaars, construction projects, etc., which are of a limited or speculative duration, generally not exceeding eighteen months. Rule 31, § III B.(a), 4 C.C.R. 723-3 (1977). In keeping with the proposal of Public Service, the PUC decision would require the temporary customer to pay the entire cost of establishing service less the net salvage value of the service facilities. Net salvage is defined as the gross salvage value less the cost of removal. There is no indication in the record whether this standard is somehow different from Public Service's existing standard for temporary service. Therefore, to the extent, if any, that the PUC's decision reflects a change in the extension policy for temporary service, such change is not supported by the record.

Indeterminate service refers to service which may be required for a period of time which is longer than temporary service but the exact duration of which cannot reasonably be predicted. Indeterminate service customers would include, for example, operators of mines and oil wells and real estate developers. Rule 31, § III A.(a), 4 C.C.R. 723-3 (1977). The PUC's decision adopted a policy for indeterminate service which divided indeterminate service customers · into two classes, real estate developers and all other indeterminate customers, and which eliminated refunds for all indeterminate customers except for real estate developers. No evidence in the record was presented which would support dividing indeterminate service customers into two classes or eliminating a refund policy for all indeterminate service customers except real estate developers.

The portions of the PUC's decision concerning temporary and indeterminate service were never really contested on appeal, and the district court did not expressly address these aspects of the decision, except that it declared the entire decision void as it applied to Public Service's application to change free construction allowances. Since it appears that the changes in policy regarding temporary and indeterminate service instituted by the PUC's decision were not supported by evidence in the record, the district court's order to set aside the PUC decision as to temporary and indeterminate service is correct. In the body of the opinion we address the issue of the extension policy for permanent service which was the issue actually contested on appeal.

4. The application proposed a free construction allowance for street lights for municipalities equal to two times the annual base rate revenue.

from a new customer, with the customer being required to pay all estimated costs in excess of this construction allowance. The effect of reducing the extension policy ratio to 1.0 would be that new customers would be required to pay higher customer advances than previously had been required. According to Public Service's calculations, the new extension ratio would raise an additional $7 million to $9 million per year. Public Service contended that this increase in charges to new customers was necessary due to the rising costs of providing electrical service. The application also sought to require a new customer to pay on a nonrefundable basis the full cost of providing a service lateral, which is a piece of conductor that connects the utility's distribution line to the customer's building to which electrical service is furnished.

A hearing on Public Service's application was conducted on September 11, 12 and 22, 1980. In addition to representatives of Public Service, a number of parties requested and were granted leave to intervene and participated in the proceedings before the PUC. The intervening parties were the Home Builders Association of Metropolitan Denver, the City of Lakewood, the City of Arvada, the Colorado Energy Advocacy Office, the Colorado Office of Consumer Services, and CF&I Steel

Corporation. The staff of the Public Utilities Commission also appeared.

Public Service presented evidence that a lower construction allowance was necessary to reflect the current economics of rendering utility service and was essential to prevent further burdening the company's existing customers with new extension costs. A great deal of testimony was presented on the method by which the company arrived at 1.0 as the appropriate extension ratio to replace the previous multiplier of 5.5.[5] In the course of the testimony it incidentally came out that approaches other than the revenue ratio method could be used for calculating free construction allowances. For example, Ronald Binz, appearing on behalf of the Colorado Energy Advocacy Office, testified that free construction allowances could be tied to some factor other than revenue—possibly the embedded cost of the distribution system averaged on a per customer basis. The focus of the hearing, however, was *not* on the availability of alternative methods for calculating free construction allowances but was on the validity of using a 1.0 multiplier to determine the new extension policy. Home Builders Association and the cities of Lakewood and Arvada presented testimony that the numbers and methodology used by Public Service to arrive at the multiplier of 1.0 were flawed.[6] In addi-

---

**5.** The derivation of the 1.0 multiplier can be summarized in equation form as follows:

$$\frac{\text{extension}}{\text{ratio}} = \frac{\text{net distribution}}{\text{plant costs}} \times \frac{\dfrac{\text{new customer}}{\text{annual revenue}}}{\dfrac{\text{total base rate}}{\text{annual revenue}}} \times \frac{\text{embedded fixed}}{\text{cost percentage}} \Big/ \frac{\text{new money fixed}}{\text{cost percentage}}$$
(existing customers)

---

Exhibit A accompanying Public Service's application indicated that based on 1978 figures the following numbers should be inserted into the equation:

$$\frac{\text{extension}}{\text{ratio}} = 352{,}387{,}000 \times \frac{\dfrac{\text{new customer}}{\text{annual revenue}}}{412{,}796{,}000} \times \frac{25.57\%}{30.57\%}$$

$$= .71 \times \text{new customer annual revenue}$$

---

.71 was rounded upwards for a proposed multiplier of 1.0.

---

**6.** For example, Dr. John Wilson, an economist specializing in the public regulation of business, testified that the 1.0 multiplier was calculated by charging existing customers based on the actual income tax rate while new customers were charged based on the statutory income tax rate prior to any deductions or credits. In addition, higher interest rates were attributed only to expenses for new customers when in reality the existing customers' consumption of energy

tion they presented evidence that the proposal would result in the inequitable treatment of new customers and that the present policy should be retained.

On December 22, 1980, the hearing examiner issued a recommended decision in which he concluded that the evidence did not support the proposed reduction in the free construction allowance. The findings of the hearing examiner centered on the validity of the proposed change from an extension ratio of 5.5 to 1.0. Although the hearing officer did find that the average embedded investment for an existing residential customer in 1978 was $233, whereas the average annual revenue per residential customer was $228, no findings were made concerning the validity of adopting some method other than the revenue ratio method for calculating free construction allowances, such as the embedded cost method. The hearing examiner viewed the extension ratio of .71 (rounded up to 1.0) as merely a fraction that resulted from dividing the component of "new plant supportable at new money costs" by the "total base rate revenues for distribution customers." He found that although Public Service had described its present 5.5 free construction allowance as "overly generous," such a policy was the norm rather than an exception in the state. In addition, the hearing examiner found that the average customer required a distribution investment, including service lateral, of $704, and generated annual base rate revenues of $374; that the average new customer required "an extension ratio or free construction allowance of only 1.9X;" and that Public Service was not really contending that an extension ratio of 5.5 was too high but that an extension ratio of 1.9 was too high.

The hearing examiner concluded as follows from these findings: that granting the application for a reduced free construction allowance, rather than preventing undue subsidization of new customers by old customers, which was the purported objective of the application, would actually result in undue subsidization of old customers by new customers; that the proposed change would cause an increase in income taxes because the customer contributions would constitute taxable income and there would be no offsetting expenses until the new facilities were constructed; that since the facilities attributable to customer contributions could not be included in the rate base, they would not be subject to depreciation, thus resulting in a shortfall in capital for eventual replacement of such facilities and in a likely request for increased rates to offset this condition; that there were no extraordinary facts or circumstances concerning Public Service's financial situation, or the environment in which Public Service provided service, which would recommend an extension ratio of 1.0; and that, although Public Service's present extension policies had not been shown to be unjust, unreasonable or unduly discriminatory,[7] the proposed revisions in the free construction allowance would be "unjust, unreasonable, and would result in undue discrimination against new customers." The hearing examiner accordingly recommended that the application be denied.

Public Service and the Colorado Office of Consumer Services filed exceptions to this recommended decision, disagreeing particularly with the finding that the new customers would be subsidizing the old customers under the proposed changes and arguing that the changes would more accurately track costs and allocate those costs to the

and demands on the system contributed to Public Service's need to invest in facilities.

7. The hearing officer also concluded that investment in new distribution facilities to the maximum extent of a 5.5X free construction allowance would not constitute "unwarranted or uneconomical investments" within the intendment of PUC Rule 31, § I(d). Rule 31, § I(d), 4 C.C.R. 723–3 (1977), provides as follows:

Each utility may write into its extension policy such qualifying clauses, limitations or explanations as it may find necessary to protect it against making unwarranted or uneconomical investments which might react adversely through rates or service upon existing customers. Each utility may establish separate policies for various territories and classes of service.

customers responsible for them. On April 21, 1981, the PUC rejected the recommended decision.[8] After noting that a free construction allowance based on the ratio of investment to revenue really results in an increased allowance for higher usage, since revenue is directly related to usage, the PUC decided that the investment to revenue ratio method for determining free construction allowances had a built-in bias against the conservation of energy. Because an allowance based upon embedded investment did not carry the inherent disincentive toward conservation, the PUC invoked the "special circumstances" provision of PUC Rule 31, § I(g), 4 C.C.R. 723–3 (1977), which states, in pertinent part, that

> [n]othing in [Rule 31] shall be construed to preclude the Commission from relieving any electric utility from the obligation imposed by its extension policy in accordance with this rule should the *special circumstances of the case warrant such relief* nor to preclude the Commission from altering, modifying or amending this rule from time to time as the Commission may deem necessary or advisable.

(emphasis added). Relying on this "special circumstances" exception of § I(g) of Rule 31, the PUC established the following general extension policy standards pending a more comprehensive revision of Rule 31:

> The *permanent service policy* should provide that:
>
> (a) A permanent service customer will be allowed a free construction allowance equal to the embedded gross distribution investment per customer. (Hereinafter referred to as the embedded investment policy).
>
> (b) The gross embedded investment per customer is to be calculated separate-

ly for residential customers and commercial-industrial customers.

> (c) Costs of an extension over the free construction allowance is [sic] to be paid by the customer as a refundable construction advance.
>
> (d) The gross embedded investment per customer is to be calculated to include the service lateral from the distribution loop.
>
> (e) Appropriate refunds are to be made to the customer by the utility if any additional customer or customers are served off the extension during the first five year period that the extension is in operation.[9]
>
> (f) With regard to street lighting, the free construction allowance shall be equal to the gross embedded investment per street light with the extension costs above that amount to be paid by the particular municipality or governmental entity involved. No refunds will be paid.

(emphasis in original). Under this new policy, gross embedded investment per customer would represent the amount of money invested by Public Service in its distribution system divided by the total number of existing customers, thus resulting in a free construction allowance equal to the average investment per customer. The PUC remanded Public Service's application to the hearing examiner "for further hearings in accordance with the policy parameters" set out in its decision, which hearings "should establish what the current embedded costs are with regard to particular categories of service."

Pursuant to this decision, the hearing examiner conducted a hearing solely for the purpose of calculating the numerical value of the free construction allowance under the embedded investment policy set

---

**8.** Under section 40–6–109(2), 17 C.R.S. (1984), the commission may adopt, reject, or, modify the findings of fact and conclusions of a hearing examiner, or after examining the record, it may enter its own decision and order without regard to the findings of fact and conclusions of the examiner. Any decision made by the commission in disregard of the hearing examiner's find-

ings, of course, must be supported by the evidence in the record.

**9.** The existing refund policy provided refunds to customers during the first five years based upon the revenues collected per customer rather than upon the number of customers.

forth in the PUC's decision and not for the purpose of considering whether the policy was reasonable or whether there were special circumstances justifying a departure from Rule 31. On September 29, 1981, the hearing examiner issued a recommended decision in which he determined that Public Service's distribution system for purposes of calculating a free construction allowance should include the cost of building its power plants, transformers, service laterals, and other equipment, but exclude the cost of distribution substations and meters. He then determined the separate allowances that should be set for different types of customers. The cities of Lakewood and Arvada and Home Builders Association filed exceptions to the hearing examiner's recommended decision. On December 1, 1981, the PUC issued its decision in which it adopted for the most part the recommended decision. Since, however, a pending general rate case had become final, the PUC ruled that the more recent cost-of-service study prepared for that case should be used to calculate the free construction allowances, such allowances to be updated within 30 days of any general rate decision and in no event less than annually. Home Builders Association thereafter filed an application for rehearing, which was denied by the PUC.

Home Builders Association then filed its petition for certiorari review in the Denver District Court pursuant to C.R.C.P. 106 and section 40–6–115, 17 C.R.S. (1984), claiming that the PUC did not regularly pursue its authority in that it engaged in rule-making without complying with the requirements of section 24–4–103, 10 C.R.S. (1982 & 1985 Supp.), of the State Administrative Procedure Act, and that the PUC's adoption of the embedded investment method for calculating free construction allowances was not supported by sufficient evidence. The district court held that the PUC's decision had the effect of modifying PUC Rule 31, 4 C.C.R. 723–3 (1977), and in that respect constituted general rule-making in violation of section 24–4–103, 10 C.R.S. (1982 & 1985 Supp.), of the State Administrative Procedure Act and section 40–6–101(1), 17 C.R.S. (1984), of the Public Utilities Law, which requires the PUC to comply with the provisions of the State Administrative Procedure Act. The court further held that the PUC denied the public and the parties the opportunity to be heard on the new rule in violation of section 40–6–109(1), 17 C.R.S. (1984).[10]

Public Service and the PUC urge us to reverse the judgment of the district court on the grounds that the PUC regularly pursued its authority and did not engage in improper rule-making, that the existence of special circumstances justified the deviation from the requirements of Rule 31, 4 C.C.R. 723–3 (1977), and that the PUC deci-

10. Section 40–6–109(1), 17 C.R.S. (1984), states that persons interested in or affected by any PUC rule or order, who have become parties to the proceeding, shall be entitled to be heard, to examine and cross-examine witnesses, and to introduce evidence. The district court concluded that, since on the PUC's remand to the hearing examiner the parties were only given an opportunity to quantify the amount of a free construction allowance based on the embedded investment policy without any opportunity to present evidence concerning the justness and reasonableness of the policy itself, the PUC illegally circumvented the provisions of Article 6 of the Public Utilities Law. The district court also held that the PUC's decision violated PUC Rule 18, 4 C.C.R. 723 (1977), which sets forth the procedures for increasing utility rates, including written advance notice of the proposed changes to utility users or consumers thirty days before the effective date of the changes, and, in addition, deprived Home Builders Association and other members of the public of due process of law. Our resolution of this case on statutory grounds renders it unnecessary to address those aspects of the district court's ruling dealing with PUC Rule 18 and due process of law.

The district court also concluded that the special circumstances exception allowing the PUC to modify the applicability of a rule in individual cases did not apply because, in the district court's view, the new extension policy constituted a major policy change not applicable solely to this case and there was no evidence in the record to support a finding of "special circumstances" justifying deviation from Rule 31, 4 C.C.R. 723–3 (1977). Since the PUC had illegally sought to amend Rule 31, the district court declared the PUC decision and the tariff sheets filed in accordance with that decision null and void.

sion was just and reasonable and in accordance with the evidence. We conclude that the PUC engaged in rule-making without complying with the necessary statutory requirements set forth in the State Administrative Procedure Act. While our resolution of the rule-making issue effectively disposes of this appeal, we elect nonetheless to address the evidentiary state of the record underlying the PUC's decision. We conclude in this respect that the PUC's adoption of the embedded investment method for calculating free construction allowances was not supported by substantial evidence when the record is considered as a whole. We accordingly affirm the judgment of the district court.

## II.

■ Before addressing the specific issues raised on appeal, it is appropriate to examine the standards applicable to judicial review of PUC decisions. The State Administrative Procedure Act governs the actions of the PUC subject to the following exceptions: a special statutory provision of the Public Utilities Law expressly made applicable to the actions of the PUC will control over the general provisions of the State Administrative Procedure Act, and any provision of the Public Utilities Law directly conflicting with the State Administrative Procedure Act will also govern. § 24–4–107, 10 C.R.S. (1982); § 40–6–101(1), 17 C.R.S. (1984). Section 24–4–106(7), 10 C.R.S. (1982), of the State Administrative Procedure Act sets forth the general standards for judicial review of agency action:

> If the court finds no error, it shall affirm the agency action. If it finds that the agency action is arbitrary or capricious, a denial of statutory right, contrary to constitutional right, power, privilege, or immunity, in excess of statutory jurisdiction, authority, purposes, or limitations, not in accord with the procedures or procedural limitations of this article or as otherwise required by law, an abuse or clearly unwarranted exercise of discretion, based upon findings of fact that are clearly erroneous on the whole record, unsupported by substantial evidence when the record is considered as a whole, or otherwise contrary to law, then the court shall hold unlawful and set aside the agency action .... In making the foregoing determinations, the court shall review the whole record or such portions thereof as may be cited by any party. In all cases under review, the court shall determine all questions of law and interpret the statutory and constitutional provisions involved and shall apply such interpretation to the facts duly found or established.

Section 40–6–115(3), 17 C.R.S. (1984), of the Public Utilities Law specifically provides for judicial review of PUC decisions and states:

> ... The review shall not extend further than to determine whether the commission has regularly pursued its authority, including a determination of whether the decision under review violates any right of the petitioner under the constitution of the United States or of the state of Colorado, and whether the decision of the commission is just and reasonable and whether its conclusions are in accordance with the evidence.

Although section 40–6–115(3) limits the scope of judicial review to three general categories—whether the PUC has regularly pursued its authority, whether its decision is just and reasonable, and whether its conclusions are in accordance with the evidence—the statute does not delineate the particular factors to be considered, or the evidentiary standard to be applied, in determining the validity of a PUC decision. We must look, therefore, to the State Administrative Procedure Act for guidance on these questions.

■ Drawing on the State Administrative Procedure Act for more specific guidelines relative to judicial review of PUC decisions is consistent with the prior decisions of this court. Whether or not the PUC has "regularly pursued its authority," for example, is a question that involves a consideration of several factors encompassed within section 24–4–106(7), 10 C.R.S.

(1982), including whether the decision is based on the evidence introduced at the evidentiary stage of the administrative process, whether the PUC order is supported by findings of fact, whether the PUC applied the legislative standards guiding its decision-making function, and whether the PUC acted within the authority conferred upon it. *Colorado Municipal League v. Public Utilities Commission,* 687 P.2d 416, 418–19 (Colo.1984). In reviewing the decision of the PUC, the record must be reviewed as a whole. *Rocky Mountain Natural Gas Co. v. Public Utilities Commission,* 199 Colo. 352, 617 P.2d 1175 (1980). In addition, while the findings and conclusions of the commission are presumed to be valid, *City of Montrose v. Public Utilities Commission,* 629 P.2d 619 (Colo.1981); *Morey v. Public Utilities Commission,* 629 P.2d 1061 (Colo.1981), and must be reviewed in the light most favorable to the commission's decision, *Morey,* 629 P.2d 1061; *People's Natural Gas Division of Northern Natural Gas Co. v. Public Utilities Commission,* 193 Colo. 421, 567 P.2d 377 (1977), a PUC decision that is not supported by substantial evidence must be set aside. *City of Montrose,* 629 P.2d 619; *Morey,* 629 P.2d 1061; *People v. District Court,* 134 Colo. 324, 303 P.2d 692 (1956); *see, Sangre de Cristo Electric Association, Inc. v. Public Utilities Commission,* 185 Colo. 321, 524 P.2d 309 (1974). It is in light of these guidelines, therefore, that we must evaluate the validity of the PUC's decision in this case.

### III.

We first consider whether the PUC failed to regularly pursue its authority by engaging in rule-making without complying with statutory requirements applicable to the proper exercise of its rule-making authority.

### A.

Under the State Administrative Procedure Act, agency action can be either adjudicative or rule-making. "Adjudication" is defined as "the procedure used by an agency for the formulation, amendment, or repeal of an order and includes licensing." § 24–4–102(2), 10 C.R.S. (1982). The referred term "order" means "the whole or any part of the final disposition (whether affirmative, negative, injunctive, or declaratory in form) by any agency in any matter other than rule-making." § 24–4–102(10), 10 C.R.S. (1982). A "rule" includes a "regulation" and is defined as "the whole or any part of every agency statement of general applicability and future effect implementing, interpreting, or declaring law or policy or setting forth the procedure or practice requirements of any agency." § 24–4–102(15), 10 C.R.S. (1982). "Rule-making" is defined as the "agency process for the formulation, amendment, or repeal of a rule." § 24–4–102(16), 10 C.R.S. (1982).

The determination of whether the PUC regularly pursued its statutory authority will thus depend on whether it was acting in an adjudicative or rule-making capacity, since the PUC's role in a given case will dictate the particular statutory procedures required to be followed. *See,* §§ 24–4–103 and 103.5, 10 C.R.S. (1982 & 1985 Supp.) (rule-making requirements); § 24–4–104, 10 C.R.S. (1982 & 1985 Supp.) (licensing); 24–4–105, 10 C.R.S. (1982) (requirements for adjudicatory proceedings). In resolving this issue we are not bound by the label the PUC attached to its actions; rather, we must look at the substance of what the commission has actually done. *Columbia Broadcasting System, Inc. v. United States,* 316 U.S. 407, 417, 62 S.Ct. 1194, 1200, 86 L.Ed. 1563 (1942). The setting of new rates for the future has been characterized as quasi-legislative, *Carroll v. Barnes,* 169 Colo. 277, 283, 455 P.2d 644, 647 (1969), and quasi-legislative action has been equated with rule-making, *Collopy v. Wildlife Commission,* 625 P.2d 994, 1003 (1981), whereas the determination of the reasonableness of existing rates has been characterized as adjudicative, *Carroll,* 169 Colo. at 283, 455 P.2d at 647.

### B.

The PUC argues that its action did not constitute rule-making because it affected

only Public Service and its customers and that special circumstances existed which permitted a deviation from Rule 31 in the case of Public Service. We are unpersuaded by these arguments.

■ A combination of several factors, no one of which would necessarily be determinative by itself, leads us to conclude that the PUC's adoption of the embedded investment method for calculating the free construction allowance constituted rule-making. First, the PUC clearly intended its decision to be of general applicability to all future permanent service customers of Public Service, who by Public Service's own estimates were expected to increase by a total of 114,412 from 1980 to 1984. Although section 24–4–103, 10 C.R.S. (1982 & 1985 Supp.),[11] clearly intends the statutory procedures for rule-making to increase the opportunity for members of the public to have input into the formulation of regulatory policy and to enable the agency to educate itself about the effects of its proposed policy on those regulated by it, *see generally Texaco, Inc. v. Federal Power Commission*, 412 F.2d 740, 744 (3d Cir. 1969), those statutory procedures were not made available to this significant group of potential customers in this case. Second, the new free construction allowance was itself cast in terms of "a permanent service policy." Under this new policy, new customers of Public Service would be entitled to a free construction allowance equal to the "embedded gross distribution investment per customer," which would be calculated separately for residential and commercial-industrial customers and would include the service lateral, with the cost of any extension over the free construction allowance to be paid by the customer and

refundable to the extent that additional customers are served off the same extension during the next five years. The adoption of this new construction allowance represents, on a very practical level, an agency statement of regulatory policy that is intended to affect a great number of people in this state. Finally, the PUC recognized the rule-making character of its action when it stated in its decision that the new free construction allowance was adopted "[p]ending a more comprehensive revision of Rule 31." We are thus satisfied that the PUC's decision is nothing less than an "agency statement of general applicability and future effect implementing [and] declaring policy," § 24–4–102(15), 10 C.R.S. (1982), and, under the particular circumstances present here, is functionally indistinguishable from *de facto* rule-making. *See, e.g., Brown Express, Inc. v. United States*, 607 F.2d 695 (5th Cir.1979); *Senn Park Nursing Center v. Miller*, 118 Ill. App.3d 504, 74 Ill.Dec. 123, 455 N.E.2d 153 (1983), *aff'd*, 104 Ill.2d 169, 83 Ill.Dec. 609, 470 N.E.2d 1029 (1984).

■ We are also satisfied that there was no special circumstance that justified the PUC in deviating from its own Rule 31 in adopting the embedded investment method for calculating the free construction allowance. The special circumstance cited by the PUC in justification of a different policy for Public Service was energy conservation. It argues in this respect that conservation was not promoted by the revenue-ratio formula in Rule 31 and that such conservation would be enhanced by the new embedded investment approach. The PUC's adoption of the embedded investment approach, however, was not tied to special conservation problems peculiar to

11. Section 24–4–103, 10 C.R.S. (1982 & 1985 Supp.), sets out a very detailed list of procedures which must be followed whenever an agency engages in rule-making, including the following: the publication of notice of the proposed rule-making, as well as the terms or the substance of the proposed rule or a description of the subjects and issues involved, § 24–4–103(3), 10 C.R.S. (1982); the submission of the proposed rule or amendment to the attorney general for his opinion as to its constitutionality and legality, § 24–4–103(8)(b), 10 C.R.S. (1982); the submission of the rule to the legislative drafting office to determine whether the rules and amendments are within the agency's rule-making authority, § 24–4–103(8)(d), 10 C.R.S. (1982); and the submission to the legislative drafting office of a fiscal impact statement identifying the types of persons who will bear the costs of the rule and the types of persons who will benefit from the rule, *id.*

Public Service's revenue-ratio formula, but represented a totally new statement of policy with respect to all revenue-ratio formulas. In effect, the PUC determined that the revenue-ratio methodology for determining free construction allowances was antithetical to energy conservation. Far from being the exclusive problem of Public Service, energy conservation is a matter of concern to all public utilities and the public at large and is the very type of concern which a rule-making proceeding is intended to address. In light of the clear and specific requirements for agency rule-making, § 24-4-103, 10 C.R.S. (1982 & 1985 Supp.), it is only when there is a truly special circumstance, peculiar to the particular case and clearly supported by the evidence, that the PUC is authorized to alter, modify, or amend its own rule in the course of an adjudicatory proceeding and, then, only to the extent necessary under the facts of the case. The State Administrative Procedure Act, in our view, does not countenance an agency's utilization of an adjudicatory proceeding for the issuance of a policy declaration of the sort involved here under the semblance of "a special circumstance." *See N.L.R.B. v. Wyman-Gordon Co.,* 394 U.S. 759, 764, 89 S.Ct. 1426, 1428, 22 L.Ed.2d 709 (1969) (plurality opinion).

The PUC has conceded in its brief that it did not follow the statutory requirements for rule-making. These statutory requirements are mandatory, and noncompliance is fatal to the agency's rule-making actions. § 24-4-103(8)(a), (b) and (d), 10 C.R.S. (1982). Since the PUC did not follow the rule-making procedure set forth in section 24-4-103, 10 C.R.S. (1982 & 1985 Supp.), the PUC's adoption of the embedded investment method for calculating the free construction allowance is void.

## IV.

Since the issue has been raised by the parties, we elect to consider whether the PUC's adoption of the embedded investment method for calculating the free construction allowance was supported by substantial evidence in the record as a whole.

"This standard [of substantial evidence] requires that there be more than merely *'some evidence* in *some particulars'* to support the agency decision." *Ross v. Fire and Police Pension Association,* 713 P.2d 1304, 1308 (Colo.1986) (quoting *Lassner v. Civil Service Commission,* 177 Colo. 257, 259, 493 P.2d 1087, 1089 (1972) (emphasis in original) ). Our review of the record satisfies us that there was not substantial evidence to support the PUC's decision in this case.

The PUC adopted the embedded investment standards for calculating free construction allowances without taking any additional evidence on the appropriateness of such standards. Although the commission could have taken notice of other evidence in its files or gathered through its own investigation, *Consolidated Freightways Corps. of Delaware v. Public Utilities Commission,* 158 Colo. 239, 406 P.2d 83 (1965), it would have been obliged to include such additional evidence in the record as certified to the district court. § 40-6-113(6), 17 C.R.S. (1984). No such evidence, however, was included in the record as certified. Our determination of the validity of the PUC's decision, therefore, is dependent on the evidence presented at the initial hearing on Public Service's application, since it is that evidence which formed the basis of the commission's decision.

The evidence presented before the hearing examiner was directed toward supporting or controverting Public Service's application. Public Service was only asking to change the extension ratio or multiplier in its free construction allowance from a five and one-half-to-one ratio in relation to a customer's annual revenues to a one-to-one ratio; it was not seeking to abandon the revenue-ratio approach established in PUC Rule 31. The policy adopted by the PUC established a free construction allowance equal to the average embedded investment in distribution plant per customer. The embedded investment method for calculating free construction allowances constituted a complete departure from the established revenue-ratio method and, in most

instances, was only incidentally mentioned in the course of the testimony. Moreover, because the parties were concerned solely with Public Service's request to change the revenue multiplier from 5.5 to 1.0, they neither focused their cross-examination on the embedded investment methodology nor developed a record in support or in contravention of the embedded investment approach.

During the hearing, James Ranniger of Public Service testified that the company's objective in adopting a new extension policy was to "create a situation where the company has invested on behalf of the new customer essentially the same as it has invested on behalf of the existing customer." Taken out of context this testimony might appear to constitute some support for the embedded investment approach. It is clear from the record, however, that Ranniger was referring not to embedded investment per customer but to investment in relation to the revenues a customer would generate. In describing the philosophy of Public Service, Ranniger stated as follows:

In the situation where ... a prospective customer is located in such a manner as to cause investments in distribution facilities which would be over and above those which represent the average upon which rates are based, it has long been the philosophy of the industry, and certainly of this company, to charge the customer the difference between the cost of the facility which can be supported by the rates charged the customer and the construction cost of those facilities.

Basically, the philosophy behind an extension policy is to create equity between existing and prospective customers insofar as *revenue levels are concerned.*

12. Embedded investment was indirectly mentioned by J.D. Heckendorn of Public Service and Ronald Binz appearing on behalf of the Colorado Energy Advocacy Office in this same context—that is, to support the proposed 1.0 multiplier and not to support a free construction allowance based entirely upon embedded investment. There was also some testimony alluding to the fact that, based on 1978 data, a

(emphasis added). He later reaffirmed that his concern was directed toward investment in relation to revenues:

Now, underlying [the proposed policy] is the company's desire from a revenue standpoint to equitably treat both existing and prospective customers, and by that I mean the revenue from either of those classes of customers should be sufficient to support the distribution investment attributable to those customers.[12]

One witness, Barbara Holme, specifically testified in favor of a free construction allowance based on embedded investment. She stated that customers already on the system were subsidized by prior customers but it was formerly cheaper to add new customers. She suggested, therefore, that each new customer receive an allowance equal to the average embedded cost for existing customers and that additional costs be borne by the new customer. Her testimony was based on the premise that new customers were subsidized by current customers. According to the information she received from Public Service, however, Public Service did not know how much of its construction budget for distribution facilities was allocable to new customers and how much to improving and reinforcing old facilities, and, therefore, it was impossible, as Holme conceded, to determine to what extent current customers were subsidizing new customers. When viewed in this light, this testimony hardly amounts to substantial evidence supporting a free construction allowance based on embedded investment per customer.

Although conservation was the PUC's stated rationale for adopting the embedded investment method and for departing from the revenue-ratio provisions of Rule 31, the evidence on the conservation goal was insubstantial. Ronald Binz, a mathematician

residential customer would receive a free construction allowance of $224 under the 1:1 revenue-ratio and a similar allowance of $233 under the embedded investment method. These oblique references to the embedded investment method add little to the total record, which, in our view, is woefully inadequate to support the PUC's decision.

appearing on behalf of the Colorado Energy Advocacy Office, testified that tying the free construction allowance to annual revenue could work against conservation because, although construction costs would be higher for electric heat, a builder might nonetheless decide to opt for electric heat instead of gas heat in order to obtain a higher construction allowance. When asked how the conservation problem could be avoided, his response was that it should first be determined whether conservation would even be a problem. Assuming it were a problem, Binz suggested one possible solution would be to tie the allowance to some factor other than revenue such as "the embedded fixed cost of plant for distribution customers." On cross-examination Binz was asked if he would prefer an approach which focused on the average embedded investment per existing customer as opposed to estimated revenue per new customer. His answer was as follows: "Only if that consideration regarding the promotion of electric space heating were borne out by some study. My position is that I agree in principle with the use of the extension ratio approach for determining the free construction allowance." Binz's testimony does not support a finding that there is a problem with conservation under the present revenue-ratio approach, much less that an embedded investment approach should be adopted.[13] Even if one were to assume that there was some need to change the free construction allowance, the fact remains that the record is lacking in substantial evidence to support the embedded investment method adopted by the PUC.

In summary, the PUC failed to regularly pursue its authority by engaging in rulemaking without complying with the provisions of the State Administrative Procedure Act, and issued a decision that was not supported by substantial evidence. The judgment is accordingly affirmed.

13. Binz's testimony was corroborated by James Ranniger of Public Service. Ranniger testified that gas is the preferred way to heat and that he thought the company was forecasting a slow-down on electric heat, thereby suggesting that builders do not choose to install electric heat even though they could get a higher free construction allowance for electric heat.