The HARTFORD FIRE INSURANCE COMPANY, Plaintiff–Appellant and Cross–Appellee,

v.

COLORADO DIVISION OF INSURANCE and Insurance Commissioner John Kezer, Defendants–Appellees and Cross–Appellants.

No. 90CA1223.

Colorado Court of Appeals, Div. IV.

Aug. 15, 1991.

Rehearing Denied Sept. 12, 1991.

Certiorari Denied Feb. 18, 1992.

Hall & Evans, Daniel R. Satriana, Jr., Robert M. Ferm, Alan J. Schmitz, Denver, for plaintiff-appellant and cross-appellee.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Eugene C. Cavaliere, Deputy Atty. Gen., Robert M. Howard, Asst. Atty. Gen., Denver, for defendants-appellees and cross-appellants.

Opinion by Judge ROTHENBERG.

The Hartford Fire Insurance Company (the Hartford) appeals the district court's judgment affirming in part the decision of the Commissioner of Insurance (the commissioner). The Colorado Division of Insurance (Division) cross-appeals that por-

tion of the trial court's judgment reversing the commissioner. We affirm in part, reverse in part, and remand with directions.

From 1971 through 1986, the Hartford provided occurrence-based medical malpractice insurance coverage to Colorado physicians and surgeons (the insureds). In January 1986, the Hartford sent its insureds form letters advising them that all policies renewed after January 1, 1986, and all new policies would be in a claims-made form of coverage.

A claims-made policy provides coverage only for claims reported while the policy is in effect. Thus, an insured must buy "tail coverage" to protect himself or herself against claims made after the policy terminates. In contrast, an occurrence-based policy provides coverage for any claim arising out of events taking place during the life of the policy regardless of when the claim is reported.

The Hartford's January 1986 letter did not explain in detail the difference between the two policies or disclose the disadvantages of a claims-made policy. However, it did explain that an insured must purchase tail coverage by paying the Hartford such premiums "as may be required by the company's rules, rates and rating plans *then in effect*," and included a schedule of percentage rates for the coverage. The letter also stressed that the Hartford offered its insureds stability and security.

At the time the Hartford decided to change to a claims-made policy form, no statute or regulation governed claims-made policies.

From January 1986 through June 1986, the Hartford marketed its claims-made policies. One incentive the Hartford offered was free tail coverage for an insured who died, retired, or became disabled while covered by the policy. This provision was available to any insured who retired at age 65 and who had been insured under a claims-made policy for at least three years.

On June 3, 1986, the Hartford informed its insureds that it had decided to withdraw from the medical malpractice insurance market by gradually not renewing all existing policies. In explaining its decision, the Hartford stated that over the past twelve months it had observed "alarming increases in loss frequency and severity particularly for the ... years 1982–1985," and that its actuarial analysis called for a 457% rate increase over its previously applicable occurrence rates. At that time, no regulation existed that governed the pattern or timing a company must follow to withdraw from a particular type of insurance business.

Also in June 1986, the Hartford filed a new rate plan with the Division containing drastically increased premiums including tail coverage premiums. In July 1986, the Hartford sent letters to its insureds informing them that it had decided not to implement the gradual withdrawal program, but instead would completely withdraw from the medical malpractice insurance market by not renewing all policies on their normal expiration date after September 1, 1986.

The Hartford stated that its decision was partly based on the increased premiums required in order to continue underwriting medical malpractice insurance policies and on the Hartford's perceived inability to price adequately its claims-made policies because of the potential length of time in which future claims could arise. The Hartford's July 1986 letter did not inform its insureds of the cost of tail coverage for the claims-made policies expiring as a result of the Hartford's non-renewal plan; however, the Hartford eventually made it clear that the 457% rate increase referred to in its June 1986 letter applied to such coverage.

The Hartford then offered its insureds the option of purchasing tail coverage at the substantially lower pre-July 1986 rates. However, this option was available only through October 31, 1986, and therefore required immediate action. Some insureds immediately terminated their claims-made policies, leaving them without medical malpractice coverage, and some insureds were forced to consider giving up their practices. Others were forced to obtain coverage from Colorado Physicians Insurance Co. (COPIC), but had to pay double premiums.

COPIC was the only other medical malpractice insurer available.

In November 1986, the Division issued a notice of charges against the Hartford pursuant to § 10–3–101 et seq., C.R.S. (1987 Repl.Vol. 4A). The Division alleged that: (1) the Hartford had failed to give its insureds the required notice of its intention of non-renewal; (2) the Hartford had misrepresented the cost of tail coverage; (3) when the Hartford switched to a claims-made insurance policy format, it either knew or should have known that it would withdraw from the Colorado medical malpractice market, and should have warned its insureds of the likelihood of such a withdrawal as well as of the adverse effects of switching to a claims-made policy under these circumstances; (4) the Hartford had willfully violated the insurance statutes by rescinding its gradual withdrawal plan; (5) the Hartford had misrepresented its financial stability to its insureds and misrepresented the availability of free tail coverage; and (6) the rate plan filed by the Hartford set excessive rates. The Division voluntarily dismissed the last count.

Following an administrative hearing, the insurance commissioner found that the Hartford had made misrepresentations to its insureds, had acted in bad faith, and had engaged in conduct which rendered its operation hazardous to the public or its policyholders. The commissioner fined the Hartford $50,000.

The Hartford then filed a complaint in the district court for judicial review pursuant to § 24–4–106, C.R.S. (1988 Repl.Vol. 4A). The trial court found substantial evidence in the record to support the commissioner's decision; however, it also construed the Colorado insurance statutes to prohibit only conduct which makes the operation of an insurance company *financially* hazardous to the public or its policyholders. Based on that interpretation of the statutes, the trial court declined to uphold the portion of the commissioner's order finding the Hartford's operations "hazardous."

## I.

## THE HARTFORD'S APPEAL

The Hartford's first contention is that the trial court erred by failing to find that the commissioner engaged in improper rule-making by adjudication. We disagree.

■ An administrative agency may make policy through either its adjudicatory or its rule-making authority. However, an agency's discretion to choose between the two is limited. *Charnes v. Robinson*, 772 P.2d 62 (Colo.1989).

■ Establishment of policy-making through adjudication is justified in circumstances in which an agency must treat matters neither anticipated previously by the agency or matters that are extremely complex and incapable of being reduced to a formalized statement of policy. Policy-making through adjudication provides a guide to the agency's position in future adjudicatory proceedings and serves the purpose of adjudicating disputed facts in a particular case. *United States v. Florida East Coast Ry. Co.*, 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); *Charnes v. Robinson, supra.*

■ In contrast, rule-making occurs when an administrative agency adopts a statement of general applicability with future effect implementing, interpreting, or declaring law or policy, or setting forth a procedure or practice requirements of an agency. The agency must comply with the rule-making procedures under the Administrative Procedure Act (APA). *See Home Builders Ass'n. v. Public Utilities Commission*, 720 P.2d 552 (Colo.1986).

The distinction between adjudication and rule-making was recently explained by our supreme court in *Colorado Office of Consumer Counsel v. Mountain States Telephone & Telegraph Co.*, 816 P.2d 278 (Colo.1991):

"In general, agency proceedings that seek to or in effect determine policies or standards of general applicability are deemed rule-making proceedings.... Agency proceedings which affect a specific party and resolve particular issues

of disputed fact by applying previously determined rules or policies to the circumstances of the case are deemed adjudicatory proceedings.... The determination of whether a particular proceeding constitutes rule-making requires careful analysis of the actual conduct and effect of the proceedings as well as a determination of the purposes for which it was formally instituted."

■ Here, the Division's notice of charges alleges that the Hartford violated several code sections while withdrawing from Colorado's medical malpractice insurance market. After a hearing, the commissioner determined that the Hartford had violated the statutes charged. Since the commissioner was not making broad policy statements but was applying the facts as he found them to be to the statutes, he did not engage in improper rule-making by adjudication.

## II.

The Hartford next argues that the commissioner lacked authority under § 10–1–101, C.R.S. (1987 Repl.Vol. 4A) to find that the Hartford acted in bad faith. We disagree.

The legislative declaration of purpose of § 10–1–101 is to:

"promote the public welfare by regulating insurance to the end that insurance rates shall not be excessive, inadequate, or unfairly discriminatory.... *Such policy requires that all persons having to do with insurance services to the public be at all times actuated by good faith in everything pertaining thereto, abstain from deceptive or misleading practices*, and keep, observe, and practice the principles of law and equity in all matters pertaining to such business." (emphasis added)

Section 24–4–104(2), C.R.S. (1988 Repl. Vol. 10A) allows an agency to take disciplinary action based upon, *inter alia*, an insurance statute's stated criteria, terms and purposes. Further, § 10–1–108(8), C.R.S. (1987 Repl.Vol. 4A) specifies that the duty of the commissioner of insurance is to:

"supervise the business of insurance in this state to assure that it is conducted in accordance with laws of this state and in such a manner as to protect policyholders and the public."

■ The primary task in construing a statute is to ascertain the legislative intent. In order to do so, a court must construe the entire act to give consistent, harmonious, and sensible effect to all its parts and must consider the ends the statute is designed to accomplish. Meaning is to be given to every word, phrase, clause, sentence, and section, if possible. *Public Service Co. v. Ingle*, 794 P.2d 1374 (Colo.App.1990).

■ Here, the commissioner concluded: "The insurance laws leave room for the discretion to allow the needed flexibility to properly protect the public....

. . . .

"[T]hese statutes provide clarity that the *Colorado Legislature intended the broadest possible interpretation and use of the statutes* in order for the commissioner and the Division of Insurance to carry out their functions and duties." (emphasis added)

We agree that the General Assembly intended to provide the commissioner with broad authority to carry out his or her duties, and that necessarily includes the authority to determine whether an insurance company has acted in bad faith. *See* § 10–1–101 and § 10–1–108(8).

## III.

The Hartford next argues that the Division failed to show that its actions constituted bad faith. We disagree.

■ An insurer owes a duty of good faith to its insureds which is implied by law as a covenant of the insurance contract. *See Surdyka v. DeWitt*, 784 P.2d 819 (Colo. App.1989).

■ In order to prove bad faith by an insurer, a party must show that: (1) the insurer's conduct was unreasonable; and (2) the insurer knew its conduct was unreasonable or recklessly disregarded the fact

that it was unreasonable. *See Travelers Insurance Co. v. Savio*, 706 P.2d 1258 (Colo.1985).

■ Here, the Division alleged in four separate counts that the Hartford breached its duty of good faith. The commissioner agreed and entered extensive findings of fact and conclusions of law finding that: the Hartford switched from an occurrence to a claims-made policy form without advising its insureds adequately of its losses; the Hartford failed to advise its insureds of the possibility of rate changes or the effect that such changes would have on the cost of tail coverage; the Hartford enticed insureds to leave more stable insurers by misrepresenting its own stability; and the Hartford enticed insureds to buy its coverage by offering free tail coverage but then rendered these benefits meaningless by withdrawing from the state.

A reviewing court may not overturn an administrative agency's factual findings when considered in light of the whole record unless they are clearly erroneous and unsupported by substantial evidence. *Lee v. State Board of Dental Examiners*, 654 P.2d 839 (Colo.1982).

The commissioner's findings here are supported by the record and they, therefore, will not be disturbed on appeal.

## IV.

■ The Hartford denies that it made misrepresentations to its insureds in marketing and issuing its claims-made policies and, thus, contends that the commissioner's findings of fact to the contrary were not supported by substantial evidence in the record. The trial court disagreed and so do we.

Section 10–3–1104, C.R.S. (1987 Repl.Vol. 4A) prohibits an insurance company from misrepresenting the terms, benefits, and advantages of its policies. Although the statutory provisions governing insurance, § 10–1–101, et seq., C.R.S. (1987 Repl.Vol. 4A), do not define "misrepresentation," the term, when used civilly, is defined as a a:

"false statement of a material fact; either known to be false when made or

made without an awareness of its truth or falsity; with the intent that one act in reliance on it; that induces justified reliance; and that results in damages."

*See Forsyth v. Associated Grocers of Colorado, Inc.*, 724 P.2d 1360 (Colo.App.1986).

The Division's notice of charges alleged the following misrepresentations by the Hartford: (1) the Hartford knew it would withdraw from the medical malpractice market at the time it changed to claims-made coverage but did not warn its insureds of the likelihood of such a withdrawal; (2) the Hartford told its insureds that it would implement a gradual withdrawal plan, but it abruptly withdrew completely; (3) the Hartford told its insureds they could purchase tail coverage at a specified percentage of the rate "in effect at the time" the tail coverage is purchased, but failed to clarify what "in effect at the time" actually meant; (4) the Hartford told its insureds it was a stable company which could survive the fluctuations of the medical malpractice market when it was not financially stable; and (5) the Hartford offered its insureds free tail coverage under certain circumstances, and then made it impossible for them to obtain such benefits.

■ If conflicting testimony is presented in an administrative hearing, the credibility of witnesses and weight to be given their testimony are decisions within the province of the agency. *See Charnes v. Lobato*, 743 P.2d 27 (Colo.1987).

Here, the commissioner addressed each count and, over disputed testimony, determined that the Division's witnesses were credible. The commissioner's finding that the Hartford violated § 10–3–1104 is supported by the record, and thus, it may not be disturbed on appeal.

## V.

### CROSS–APPEAL BY DIVISION OF INSURANCE

The Division contends that the trial court construed §§ 10–1–111(1)(h) and (i), C.R.S. (1987 Repl.Vol. 4A) too narrowly by ruling that the statute prohibits an insurer only from engaging in conduct that is *financial-*

*ly* hazardous to the public or its policyholders, as opposed to any "hazardous" conduct. We agree.

Section 10–1–111(1) provides that the commissioner may revoke or suspend a certificate of authority of an insurance company for:

"(h) Use of methods which, although not otherwise specifically proscribed by law, nevertheless *render its operation hazardous,* or its condition unsound, *to the public or to its policyholders;*

"(i) Failure to otherwise comply with the law of this state, if *such failure renders its operation hazardous to the public or to its policyholders."* (emphasis added)

The Division's position is that since the statute does not contain the term "financially" to modify the word hazardous, §§ 10–1–111(1)(h) and (i) as written prohibit an insurer from engaging in *any* conduct which is generally hazardous to its insureds or to the public.

Using the Division's interpretation, the Hartford engaged in hazardous conduct by issuing its insureds claims-made policies without warning them of the negative effects of switching to such a policy, by withdrawing its gradual-withdrawal plan, by failing to advise its insureds of the effect which a rate increase would have on the tail coverage, and by failing to explain clearly the cost of tail coverage.

The Division further contends that the Hartford's actions which forced its insureds to close their practices or to give notice to their patients that they may be closing their practices constituted hazardous conduct, as did the Hartford's other actions involving the 457% rate increase for tail coverage, and the payment of double premiums by insureds to join COPIC.

The commissioner agreed with the Division's interpretation of § 10–1–111 and found that the Hartford had violated the statute.

On the other hand, the Hartford contends that the statute, when construed properly, prohibits an insurance carrier from engaging in conduct which is finan-

cially hazardous to its insureds or the public. Using the Hartford's interpretation, its conduct in changing to a claims-made policy does not fall within the conduct prohibited by the statute.

The trial court agreed with the Hartford.

This is a close question, and we are unaware of any reported Colorado cases on point. The Hartford relies on three cases from other jurisdictions, *Kueckuelhan v. Federal Old Line Insurance Co.,* 69 Wash.2d 392, 418 P.2d 443 (1966); *In re Bohlinger,* 305 N.Y. 258, 112 N.E.2d 280 (1953); and *Caminetti v. Imperial Mutual Life Insurance Co.,* 59 Cal.App.2d 476, 139 P.2d 681 (1943), which hold that the term "hazardous operation" relates only to financially hazardous activity. *See also Eakin v. American Underwriters Group Insurance,* 552 N.E.2d 50 (Ind.App.1990); 2A G. Couch, *Cyclopedia Insurance Law* § 22:13 (R. Anderson 2d ed. 1984).

However, in all three cases, the courts were construing statutes analogous to § 10–3–501, et seq., C.R.S. (1987 Repl.Vol. 4A) (the Uniform Insurers Liquidation Act), granting the insurance commissioner powers to consolidate, reorganize, and dissolve insolvent or financially troubled insurance companies.

In contrast, § 10–1–111 not only involves the rehabilitation of financially troubled insurance companies, but also gives our insurance commissioner broad powers to suspend or revoke certificates for a number of reasons including: (1) insolvency or impairment; (2) failure or refusal to submit annual reports; (3) engaging in unauthorized insurance activities; (4) refusal to submit to examination or pay for same; and (5) failure to comply with state law which makes the company's operation hazardous to the public and its policyholders. We therefore find the cases relied upon by the Hartford distinguishable.

 In construing a statute, words and phrases must be given their plain and ordinary meaning and strained interpretations should be avoided. *Federal Land Bank v. Needham,* 759 P.2d 799 (Colo.App. 1988). Construction of a statute by administrative officials charged with its enforce-

ment is to be given some deference by the court. *Redin v. Empire Oldsmobile, Inc.,* 746 P.2d 52 (Colo.App.1987). *See also* § 2–4–201(1)(b), C.R.S. (1980 Repl.Vol. 1B).

 Accordingly, while the trial court's ruling here was entirely plausible, absent law to the contrary, we decline to read into the statute language that the General Assembly failed to put there and to limit the broad powers given to the commissioner under § 10–1–111. Our ruling is butressed by the fact that another section of the code which governs property and casualty insurance specifically refers to "a *financial* condition hazardous to the policyholders or the public." *See* § 10–4–513(6), C.R.S. (1987 Repl.Vol. 4A). However, the modifier, "financial," is not included in § 10–1–111(1).

We therefore hold that § 10–1–111(1) pertains to any hazardous condition and is not limited to any financially hazardous condition. *See Redin v. Empire Oldsmobile, Inc., supra.*

Hence, the judgment of the trial court is affirmed in all respects except its reversal of that part of the commissioner's order concerning "hazardous" activity by the Hartford. That part of the judgment is reversed, and the cause is remanded with directions that the insurance commissioner's order be affirmed in its entirety.

STERNBERG, C.J., and HUME, J., concur.