**Mary Patricia ROSS, Petitioner,**

v.

**FIRE AND POLICE PENSION ASSOCIATION, Respondent.**

**No. 84SC65.**

Supreme Court of Colorado, En Banc.

Feb. 10, 1986.

---

Bruno & Bruno, P.C., Louis B. Bruno, Lakewood, for petitioner.

Tallmadge, Tallmadge, Wallace & Hahn, P.C., C. Thomas Bastien, John W. Smith, Denver, for respondent.

QUINN, Chief Justice.

We granted certiorari to review the decision of the court of appeals in *Ross v. Fire & Police Pension Association*, 682 P.2d 496 (Colo.App.1984), which reversed a district court judgment that allowed Denver police officer Mary Patricia Ross to receive occupational disability benefits. The district court had overturned the Fire and Police Pension Association Board's denial

of Ross' application for benefits, and the court of appeals reversed, holding that there was sufficient evidence in the record to support the Board's denial of the application. We affirm the judgment of the court of appeals.

### I.

On February 16, 1982, Ross filed her application for occupational disability retirement benefits with the Fire and Police Pension Association Board (Board),[1] claiming that she was occupationally disabled as a result of injuries sustained in an on-duty automobile accident on March 29, 1981. Her condition was later diagnosed as thoracic outlet syndrome, a painful disorder of the back and upper body.[2] In order to obtain relief from the pain, Ross underwent the surgical removal of her left rib.[3] Ross had been previously assigned to patrol duties and claimed that she had lost upper arm and hand strength and that riding in a police vehicle for a sustained period of time aggravated the muscle tension in her neck, back, and shoulders.

When Ross filed her application, an "occupational disability" was defined as "a disability from any cause resulting in permanent incapacity to perform assigned duties." Ch. 316, sec. 1, § 31–30–1002(6), 1979 Colo.Sess. Laws 1189, 1190.[4] After Ross filed her application with the Board, the Chief of the Denver Police Department, pursuant to section 31–30–1007(4), 12 C.R.S. (1985 Supp.), certified to the Board that there was no other department position for which Ross could carry out assigned duties. The Board then appointed a panel of three orthopedic surgeons, each of whom conducted a separate examination and filed a report with the Board. The reports filed by each physician detailed

1. Section 31–30–1004(2)(a), 12 C.R.S. (1985 Supp.), provides for a board of nine members, appointed by the governor and confirmed by the senate for four year terms, who serve as the board of directors and governing body of the Fire and Police Pension Association. Pursuant to this same statute, the composition of the Board is as follows:

    (I) Two members who shall represent Colorado municipal employers;
    (II) One member who shall represent full-time paid firemen;
    (III) One member who shall represent full-time paid policemen;
    (IV) One member who shall be a retired fireman who, upon completion of his term, shall be replaced by a retired policeman. Thereafter, the appointments of retired officers shall alternate between a retired fireman and a retired policeman for each successive four-year term.
    (V) One member of a board of directors of a special district or the full-time paid professional manager of a special district who shall represent special districts having volunteer firemen;
    (VI) One member from the state's financial or business community with experience in investments;
    (VII) One member from the state's financial or business community with experience in insurance disability claims; and
    (VIII) One member of the state's financial or business community experienced in personnel or corporate administration in corporations of over two hundred employees.

2. Characteristic symptoms of thoracic outlet syndrome include numbness, tingling, and pain in the upper arms and body as a result of pressure on the nerves and blood vessels behind the collar bone. L. Wolfstone, J. Leibman, R. Bingham, & C. Parnell, 2A Courtroom Medicine: The Neck, § 39.00 (1985). While the exact causal relationship is not understood, thoracic outlet syndrome is often preceded by trauma. 5A Lawyers' Medical Cyclopedia of Personal Injuries & Allied Specialties, § 33.46(a) (1984 Supp.). The traumatic type of causation can be associated with any injury that causes a severe and sudden jerk of the shoulder and neck, including the acute hyperextension of the cervical spine more commonly known as "whiplash." 2A Courtroom Medicine §§ 39.20 and 34.34(4).

3. The record indicates that Ross had been involved in two previous on-duty automobile accidents, one on March 15, 1979, and the other on June 10, 1979, in which she suffered injuries to her neck, back, and shoulders. Her condition at that time was also diagnosed as thoracic outlet syndrome. In August 1980, Ross underwent surgery for the removal of her right front rib, which apparently relieved part of her pain. She was able to return to work in October 1980.

4. In 1983 the legislature amended the definition of "occupational disability" to "a disability resulting in an incapacity to perform assigned duties and expected, with reasonable medical probability, to exist for at least one year." Ch. 368, sec. 3, § 31–30–1002(6), 1983 Colo.Sess. Laws 1267, 1268. This new definition, of course, plays no part in our resolution of this case.

Ross' various complaints, including discomfort in her neck and upper back, weakness in her left arm and hand, and an occasional feeling of lack of support in her left knee. The physical examination by each physician failed to uncover any objective signs that might account for Ross' complaints. The report of one of the orthopedic surgeon members of the panel, which is representative of all three reports, stated:

> [Ross] has an essentially normal range of motion of her neck. I could see no evidence of muscle spasm. She did complain of a slight tenderness to palpation over the left sternocleidal mastoid muscle. The trapezius muscles appeared normal. There was no evidence of any swelling, inflammation or tenderness. She had excellent range of motion in both shoulders without any difficulty. She had good pulses in both upper extremities and the pulses remained good with maximum abduction and external rotation. Sensory, motor and reflex examination of the upper extremities was normal. Tape measurement revealed the arms to be equal in circumference. The forearm measur[e]ment showed that the right forearm was slightly larger in circumference than the left, a finding which is normal for an individual who is right handed. (This patient is right handed.) I examined the patient's left knee. She has a full range of motion with good stability, no swelling, no tenderness and no crepitation.

X-ray examinations by each physician were also essentially negative, as indicated by the following excerpt from one of the reports:

> There were no findings compatible with recent or old osseous and/or articular trauma. The interspaces were well-maintained, as were the exit foramina and facet articulations. Bilateral absence of the first ribs was noted. There were no findings compatible with metastatic and/or metabolic disease. The osseous texture was not unusual, nor were the soft tissue shadows.

Each of the orthopedic surgeons determined that Ross was not occupationally disabled and that nothing prevented her from returning to work.

Because section 31–30–1007(4), 12 C.R.S. (1985 Supp.), expressly provides that "[t]he Board shall not make a determination of disability unless two of the three physicians examining the applicant agree that a disability exists," the Board denied Ross' application on April 21, 1982. Rule 505.08.-05 of the Fire and Police Pension Association Rules and Regulations provides that, in the event a majority of the physicians appointed by the Board does not find a legally compensable disability, the applicant may file a written request for an evidentiary hearing on the limited issue of whether a re-examination should be ordered. Ross filed such a request on May 5, 1982, and the Board conducted a hearing on the request. Ross' personal physician testified at the hearing that Ross' overall condition was "thoracic outlet syndrome," but further stated that there was no objective way to diagnose the condition. The Board granted Ross' request for re-examination and appointed a panel of three thoracic surgeons to conduct the examinations.

The thoracic surgeons found that Ross expressed the same complaints as noted by the physicians on the first panel. One of the thoracic surgeons concluded that Ross was occupationally disabled, but was not able to determine whether this condition was based on "emotional, psychological or physical findings relative to thoracic outlet syndrome." The second thoracic surgeon was of the opinion that Ross, although unable to perform her assigned duties, could perform other types of police work.[5]

---

**5.** One of the thoracic surgeons found Ross "occupationally disabled," while another found her "occupationally disabled for police patrol duties." Section 31–30–1002(6), 12 C.R.S. (1983) requires, and the doctors were so instructed, that Ross was to be evaluated medically in relation to her ability to "perform assigned duties." Because it is clear that the examining physicians were aware that Ross' assigned duty was police patrol, we interpret the second doctor's opinion that Ross was "occupationally disabled for patrol duty" as no more than a clarification of his ultimate findings, *i.e.*, that Ross was occupationally disabled with respect to her assigned duties. As such, we do not believe that his statement

The third thoracic surgeon declined to render an opinion until further objective testing could be performed. At a final hearing conducted on August 20, 1982, at which both the Board's medical advisor and Ross' attorney made oral arguments to the Board, the Board once again denied Ross' application.

Relying on both section 24–4–106, 10 C.R.S. (1982) of the State Administrative Procedure Act and C.R.C.P. 106, Ross filed a petition for judicial review in the Denver District Court. She claimed that the Board had exceeded its jurisdiction or abused its discretion in denying her application at the final hearing on August 20, 1982, by considering the reports of the first panel of orthopedic surgeons. She also contended that the evidence overwhelmingly supported a determination that she was occupationally disabled. The district court held that the Board's decision was reviewable under the standards of the State Administrative Procedure Act, in particular section 24–4–106(7), 10 C.R.S. (1982), which requires that any agency action be supported by substantial evidence when the record is considered as a whole. The district court then took note of Fire and Police Pension Association (FPPA) rule 505.08.05, which states that "[i]f the Board orders a re-examination, then the case shall proceed in all particulars as a new case." This rule, in the district court's view, prohibited the Board from considering the reports by the first panel of orthopedic physicians at the final Board hearing on August 20, 1982. The district court held that the Board abused its discretion by taking such evidence into account and that, in the absence of such evidence, nothing in the record supported the Board's denial of Ross' application. The district court, therefore, vacated the Board's decision and ordered the Board to grant Ross occupational disability retirement benefits retroactive to March 30, 1982.

The Board appealed to the court of appeals. Noting that it would reach the same result under either the review standard of the State Administrative Procedure Act or the standard applicable to C.R.C.P. 106, the court of appeals reversed the judgment because, in its view, there was nothing in the record to indicate that the Board had considered the opinions of the initial panel of orthopedic surgeons in reaching its ultimate determination and that, in addition, there was sufficient evidence in the record to support the Board's denial of Ross' application. We granted certiorari to consider whether the court of appeals erred in reversing the district court's judgment granting occupational disability retirement benefits to Ross.

## II.

Before considering the validity of the Board's denial of occupational disability retirement benefits to Ross, it is appropriate that we address two preliminary matters: (1) the appropriate standard applicable to a judicial review of the Board's decision; and (2) the particular fund of evidence which the Board could properly consider in reaching its final decision.

## A.

■■■ The district court applied the standard of review applicable to state agency actions as set out in section 24–4–106(7), 10 C.R.S. (1982), of the Administrative Procedure Act. Under this standard, a reviewing court can reverse a state agency's decision if "the agency action is ... unsupported by substantial evidence when the record is considered as a whole." *See DeScala v. Motor Vehicle Division*, 667 P.2d 1360 (Colo.1983); *Lassner v. Civil Service Commission*, 177 Colo. 257, 493 P.2d 1087 (1972). This standard requires that there be more than merely *"some evidence in some particulars"* to support the agency decision. *Lassner*, 177 Colo. at 259, 493 P.2d at 1089 (emphasis in original). In contrast to this "substantial evidence" standard, judicial review pursuant to C.R. C.P. 106(a)(4)[6] permits a district court to

---

differs qualitatively from the opinion of the first thoracic surgeon.

6. When Ross filed her complaint for judicial review, C.R.C.P. 106(a)(4) vested the district court with jurisdiction under the following circumstances:

reverse a decision of an inferior tribunal only if there is "no competent evidence" to support the decision. *E.g. Corper v. City and County of Denver,* 191 Colo. 252, 552 P.2d 13 (1976); *Bauer v. City of Wheat Ridge,* 182 Colo. 324, 513 P.2d 203 (1973); *Civil Service Commission v. Doyle,* 162 Colo. 1, 424 P.2d 368 (1967). "No competent evidence" means that the ultimate decision of the administrative body is so devoid of evidentiary support that it can only be explained as an arbitrary and capricious exercise of authority. Under either the "substantial evidence" or "no competent evidence" standard, the appropriate consideration for an appellate court is whether there is sufficient evidentiary support in the record for the decision of the administrative tribunal, and not whether there is an adequate source of evidence to support the decision of the district court. *See, e.g., DeScala,* 667 P.2d 1360; *MacArthur v. Presto,* 122 Colo. 202, 221 P.2d 934 (1950).

■ We conclude that the Board is not a state agency for purposes of the State Administrative Procedure Act and that, therefore, section 24–4–106(7) does not apply to judicial review of its actions. Although the State Administrative Procedure Act defines an "agency" to include ·any Board of the state, § 24–4–102(3), 10 C.R.S. (1985 Supp.), the statutory scheme creating the Fire and Police Pension Association expressly states that "[t]he association shall be a body corporate and a political subdivision of the state and shall not be an agency of state government and shall not be subject to administrative direction by any department, commission, board, or agency of the state." § 31–30–1004(1), 12 C.R.S. (1985 Supp.). Since the General Assembly clear-

ly intended that the Association not be considered an agency of state government, it necessarily follows that the Board, which by statute is the governing body of the association, § 31–30–1002(2), 12 C.R.S. (1985 Supp.), must also be excluded from "agency status" for purposes of the State Administrative Procedure Act. Because the Board is not a state agency, the appropriate standard of review is therefore not the "substantial evidence" standard codified in section 24–4–106(7) but rather the "no competent evidence" standard of C.R. C.P. 106(a)(4).

## B.

■ The district court also ruled that, once the Board granted Ross' request for re-examination, FPPA rule 505.08.05 required the Board to resolve Ross' application without giving any consideration whatever to the reports of the first panel of orthopedic surgeons. In reviewing the judgment of the district court, the court of appeals stated that "[t]here is nothing in the record to indicate that at the hearing following the reexaminations the board considered the opinions of the initial panel of physicians." 682 P.2d at 497. Although we disagree with the court of appeals' interpretation of the record, we nonetheless conclude that nothing in FPPA rule 505.08.05 prohibited the Board from considering the reports by the first panel of physicians in reaching its ultimate decision.

The record shows that the Board briefly reviewed the reports of the first panel of physicians before proceeding with the final hearing on August 20, 1982. At the commencement of that hearing the Board's

Where an inferior tribunal (whether court, board, commission or officer) exercising judicial or quasi-judicial functions, has exceeded its jurisdiction or abused its discretion, and there is no plain, speedy and adequate remedy. Upon the filing of the complaint the court shall direct the issuance of a citation to the inferior tribunal to show cause why the relief requested shall not be allowed. If the complaint is supported by an affidavit the order to show cause may be issued, or the court may forthwith order the inferior tribunal, or any person having custody of the

records of the proceedings described in the complaint, to certify to the court at a specified time and place a transcript of the record and proceedings, or such portion thereof as the court may direct. If a stay of proceedings is granted the citation or order shall so state. Review shall not be extended further than to determine whether the inferior tribunal has exceeded its jurisdiction or abused its discretion.

Rule 106(a)(4) has since been amended with an effective date of January 1, 1986.

medical advisor pointed out in an opening statement that the "[p]ast history and other information related before this will not be reiterated here as this information is available in the Pension Association files." Ross' attorney not only failed to object to the medical advisor's suggestion that this fund of evidence was available to the Board, but alluded in his own presentation to some medical testimony presented at the prior hearing on Ross' request for re-examination. These references in the record sufficiently demonstrate that the Board was proceeding on the assumption that it could, and undoubtedly did, consider the reports of the first panel of physicians in denying Ross' application at the conclusion of the hearing on August 20, 1982.[7] We conclude, however, that FPPA rule 505.08.-05 did not prohibit the Board from considering the reports submitted by the first physician panel.

Section 31–30–1007(4), 12 C.R.S. (1985 Supp.), provides the Board with the following general guidelines for determining applications for disability benefits:

> The determination of disability, whether occupational or total, shall be made by the board, and the board shall consider a report to be made by a panel of three physicians. . . . The board shall not make a determination of disability unless two of the three physicians examining the applicant agree that a disability exists, but the board shall not be bound by the physicians' determination that a disability exists.

Section 31–30–1005(1)(j), 12 C.R.S. (1985 Supp.), requires the Board to promulgate such rules and regulations as may be necessary to implement its statutory responsibilities in connection with fire and police pension plans. FPPA rule 505.08.05, which was promulgated pursuant to the Board's rulemaking responsibility, states that "[i]f the Board orders a re-examination, then the case shall proceed in all particulars as a new case, under 505.01.11(a)." FPPA rule 505.01.11(a), to which rule 505.08.05 expressly refers, requires the Board, upon receipt of an application for disability benefits, to first determine whether it has jurisdiction, and then, after determining that jurisdiction exists, to consult with its medical advisor and appoint a panel of three physicians in accordance with the same basic procedures as outlined in section 31–30–1007(4).[8] After the physicians have filed their reports, FPPA rule 505.04.02 requires the Board to promptly schedule an initial hearing. FPPA rule 505.04.03 states that if the Board determines at the initial hearing that a majority of the physician panel has not found a legally compensable disability, then the hearing shall terminate, the applicant shall be notified of the denial, and any allowable judicial review may then proceed.

When FPPA rule 505.08.05 is viewed in the context of the overall procedural framework for resolving disability retirement applications, we believe the purpose of the rule is not to require the Board, once a

---

7. That the Board did in fact consider the entire medical record in denying Ross' application is clear from the following statement of one of the members in discussing a motion made by the Board member to deny the application:

> I think this is a very complicated case, I think that there are, there is lots of medical testimony, it is in some parts contradictory and in some parts its [sic] very vague but in my mind, I cannot see a sufficiently clear nexus between the injuries that the Officer suffered and her inability to perform her job. Basically, although the evidence, most of the, at least part of the reason for granting an occupational disability from the doctors is based upon psychological or what are called overlay factors, and that find that not to be sufficiently credible compared to the rest of the record taken

as a whole. And therefore I will also vote to deny the application.

8. FPPA rule 505.01.11(a) states:

> If the FPPA determines that it has jurisdiction it shall, in consultation with its medical advisor, appoint a panel of three physicians to examine the applicant. Two of the three physicians shall be on the staff of a state agency or institution or shall be recommended by [the Fire and Police Pension Association's] medical advisor. One physician shall be appointed by the Board.

The jurisdictional determination is required because section 31–30–1003, 12 C.R.S. (1985 Supp.), exempts or partially exempts certain pension plans from the statutory scheme creating the Board.

request for re-examination has been granted, to resolve the merits of the application solely on the basis of the reports of the second panel of physicians. On the contrary, the purpose of the rule, as we see it, is to require the Board, once a request for re-examination has been granted, to restrict its consideration solely to the reports by the second panel of physicians in determining whether to consider anew the merits of the applicant's claim of occupational disability. If, for example, none or only one of the three physicians on the second panel were to determine that the applicant is occupationally disabled, then both section 31–30–1007(4), 12 C.R.S. (1985 Supp.) and FPPA rule 505.04.03 would require a summary denial of the claim. If, on the other hand, two of the three physicians of the second panel were to agree that the applicant is occupationally disabled, FPPA rule 505.08.05 would require the Board to determine the merits of the claim. Once the Board has made the threshold determination that the reports of the second panel of physicians warrant further consideration of the application on the merits, however, we see nothing in the language of FPPA rule 505.08.05 that indicates an intent to prohibit the Board from considering all the medical evidence entered in the record, including the reports by the first panel of physicians, in making its ultimate decision. Such a prohibitory construction would deprive the Board of relevant medical evidence in determining whether the applicant is disabled to the point of being permanently incapable of performing assigned duties. In the absence of a clear expression that the Board intended to so restrict itself in carrying out its statutory responsibility of adjudicating disability retirement applications, we decline to engraft such a limitation onto the rule.

### III.

■ We turn then to consider whether the court of appeals correctly ordered the reinstatement of the Board's decision. We conclude that, under the standard of judicial review applicable to a proceeding commenced in the district court under C.R.C.P. 106(a)(4), there was competent evidence in

the record to support the Board's denial of occupational disability benefits to Ross.

■ While two of the three thoracic surgeons who examined Ross were of the opinion that she was occupationally disabled with respect to her assigned duties, the three orthopedic surgeons who initially examined her concluded that she was not occupationally disabled and could return to work. There can be no question from the medical evidence entered into the record that Ross had been experiencing some soreness in her upper back, some loss of mobility in her neck and shoulders, and a feeling of numbness in her fingers. It does not necessarily follow from these symptoms, however, that she was permanently incapable of performing her assigned duties as a police officer. On the contrary, what the record here emphatically demonstrates is that the question of Ross' eligibility for occupational disability benefits was the source of divergent medical opinions by two panels of physicians. Resolution of that question, under these circumstances, was for the Board. We are satisfied that there is competent evidence in the record to support the Board's decision.

The judgment of the court of appeals is affirmed.