2016 COA 54

**FRIENDS OF THE BLACK FOREST PRESERVATION PLAN, INC., a Colorado non-profit corporation; Richard Babcock; Jennifer Babcock; Brenda S. Baldry; Karen R. Coppeak; Remi Y. Gagne; Charlotte R. Gagne; Leif Garrison; James C. Kesser; Sharon Kesser; James A. Orban; Patricia E. Orban; Laura N. Spear; Timothy J. Spear; Wallace J. Stenhaug; Sandra A. Stenhaug; and Margaret J. Whitley, Plaintiffs–Appellants,**

v.

**BOARD OF COUNTY COMMISSIONERS OF EL PASO COUNTY, Colorado; and Black Forest Mission, LLC, a Wyoming limited liability company, Defendants–Appellees.**

**Court of Appeals No. 15CA0034**

Colorado Court of Appeals,
Div. I.

Announced April 7, 2016

Flynn Wright & Fredman, LLC, Eric Bentley, Colorado Springs, Colorado, for Plaintiff–Appellants.

Amy R. Folsom, County Attorney, Kenneth R. Hodges, Senior Assistant County Attorney, M. Cole Emmons, Senior Assistant County Attorney, Colorado Springs, Colorado, for Defendant–Appellee Board of County Commissioners of El Paso County, Colorado.

Mulliken Weiner Berg & Jolivet P.C., Murray I. Weiner, Joe D. Kinlaw, Colorado Springs, Colorado, for Defendant–Appellee Black Forest Mission, LLC.

Opinion by CHIEF JUDGE LOEB

¶ 1 In this C.R.C.P. 106(a)(4) action, plaintiffs, Friends of the Black Forest Preservation Plan, Inc., and several residents of the Black Forest area in El Paso County, appeal the district court's judgment affirming the decision of defendant Board of County Commissioners of El Paso County (the Board) approving the special use permit application of defendant Black Forest Mission, LLC (BFM) to construct a greenhouse operation in the Black Forest preservation area. We affirm.

I. Background and Procedural History

¶ 2 BFM proposed to construct a 51,834–square–foot (1.19 acre) greenhouse for a veteran–owned and -operated agricultural entity known as Minibelly's Farm, LLC on its property located in the Black Forest area of El Paso County. BFM sought to build a hydroponic wholesale production greenhouse for the purpose of growing organic vegetables to sell to grocery chains and other retailers such as Whole Foods, Albertson's, King Soopers, and Natural Grocers. BFM owned 41.38 acres of land in the Black Forest, and it proposed to build the greenhouse on one of its 4.87 acre lots.

¶ 3 The property on which BFM intended to construct its greenhouse falls within the area governed by the Black Forest Preservation Plan (BFPP), the pertinent small area plan (SAP) that is incorporated into El Paso County's overall master plan.[1] BFM's parcel is located within the "Timbered Area" subarea of the Black Forest, an area generally forested with Ponderosa pine trees. Additionally, BFM's property is within the RR–5 zoning district, a residential, rural five-acre district.

¶ 4 Pursuant to the El Paso County Land Development Code (Land Development Code), the RR–5 zoning district is "a 5 acre district intended to accommodate low-density, rural, single-family residential development." El Paso Cty. Land Dev. Code § 3.2.2(A). For zoning purposes in the RR–5 zoning district, property owners are allowed to build greenhouses on their land if the greenhouse is less than one acre in size, but property owners must apply for and obtain a special use permit if they wish to build a greenhouse greater than one acre in size.

¶ 5 On November 8, 2013, BFM submitted an application to the El Paso County Development Services Department for a special use permit to build its proposed hydroponic wholesale production greenhouse.[2] BFM

---

1. El Paso County's master plan is comprised of multiple documents, including the El Paso County Policy Plan (Policy Plan) and ten SAPs. The Policy Plan functions as the overall policy element of the County's master plan, and the SAPs are incorporated as elements into the master plan to guide proposed land use on a "subregional" scale. The BFPP is one of the ten SAPs that is incorporated into the overall master plan.

2. The parties dispute whether or not BFM's greenhouse project is classified as a "commercial" or an "agricultural" use of the land. Regardless of the classification, BFM was required to obtain a special use permit for a greenhouse

proposed to build the 51,834–square–foot greenhouse from corrugated steel, and the main access point for the greenhouse would be from a driveway along Lindsey Lane, which was a residential cul-de-sac. The Department of Development Services Director forwarded BFM's application to the El Paso County Planning Commission[3] for consideration and a public hearing.

¶ 6 The Planning Commission's public hearing took place on January 7, 2014. During the hearing, a number of local residents opposed the application as being incompatible with existing and permitted uses in the neighborhood. The Planning Commission ultimately recommended, by a 6–2 vote, that the Board deny BFM's application because of its inconsistency with both El Paso County's Policy Plan and the BFPP.

¶ 7 On February 25, 2014, BFM's special use permit application was presented to the Board at a public hearing. Pursuant to the special use application review standards contained in section 5.3.2(B)(2) of the Land Development Code, the Board was required to make a number of specific findings before approving a special use permit, one of which was that the special use was "consistent with the applicable Master Plan." Following testimony from the Planning Commission and many local residents, BFM was granted a continuance to amend its application to attempt to ameliorate various concerns of the Planning Commission and residents.

¶ 8 On March 18, 2014, BFM presented a revised plan to the Board for its greenhouse project. Rather than its original plan to construct a single greenhouse of 51,834 square feet, BFM proposed to build three smaller greenhouses connected by a head house, with construction occurring in three separate phases. The proposed structures would total approximately 60,000 square feet and would be built on two parcels instead of one. BFM modified the location of the proposed structures to mitigate the residents'

concerns related to light pollution, obstruction of views, and traffic congestion, and it also proposed to move the main access point away from Lindsey Lane.

¶ 9 Many residents of the area attended the second hearing before the Board and argued that BFM's amended application still failed to address the community's concerns. A member of the County's Planning Commission testified at the hearing that BFM's amended application was "generally consistent" with the County's overall Policy Plan but remained inconsistent with the BFPP, particularly with the portions of the BFPP that emphasize that the Black Forest area was intended to remain primarily a rural-residential community and that new commercial uses should be strictly limited in the Timbered Area. However, an El Paso County Attorney advised the Board that master plans are generally only advisory and that the Board had the authority to interpret its Land Development Code and the elements of the County master plan. At the conclusion of the hearing, the Board voted 3–2 to approve BFM's amended special use permit application. The Board then formally adopted a resolution approving the application and making all of the specific findings required by section 5.3.2(B)(2) of the Land Development Code.

¶ 10 Plaintiffs then filed this action, seeking judicial review of the Board's decision pursuant to C.R.C.P. 106(a)(4). Plaintiffs contended, and still contend on appeal, that the Board misapplied governing law, and thereby abused its discretion, when it approved BFM's special use permit application based on the erroneous belief that the County's master plan was merely advisory. According to plaintiffs, the County's master plan lost its advisory nature and its provisions became binding regulations when the plan was incorporated in Land Development Code section 5.3.2(B)(2). *See* § 30–28–106(3)(a), C.R.S.2015. Because section

---

greater than one acre in size. Additionally, the Land Development Code defines "[a]gricultural [b]usiness" as "[a] *commercial* activity directly related to or resulting from the cultivation of the soil, production of crops or the raising of livestock." Land Dev. Code § 1.15 (emphasis added).

**3.** The Planning Commission is a nine-member body appointed by the Board. Land Dev. Code § 2.2.2(A). The Planning Commission makes recommendations to the Board concerning special use applications. *Id.* § 2.2.2(B)(7).

5.3.2(B)(2) requires the Board to find that a special use is "consistent with the applicable Master Plan," and because the BFPP states that the Black Forest area should remain primarily residential and that commercial development in the Timbered Area should be strictly limited, plaintiffs contend the Board abused its discretion when approving BFM's special use application.

¶ 11 The district court affirmed the Board's decision, finding that the El Paso County master plan explicitly retained its advisory nature and that there was competent evidence in the record supporting the Board's decision to approve BFM's special use permit application. This appeal followed.

## II. Standard of Review

¶ 12 C.R.C.P. 106(a)(4) provides for judicial review of agency action "[w]here any governmental body or officer or any lower judicial body exercising judicial or quasi-judicial functions has exceeded its jurisdiction or abused its discretion, and there is no plain, speedy and adequate remedy otherwise provided by law[.]" Judicial review is strictly "limited to a determination of whether the body or officer has exceeded its jurisdiction or abused its discretion, based on the evidence in the record before the defendant body or officer." C.R.C.P. 106(a)(4)(I). A governmental body abuses its discretion if its decision is not reasonably supported by any competent evidence in the record or if the governmental body has misconstrued or misapplied applicable law. *Giuliani v. Jefferson Cty. Bd. of Cty. Comm'rs*, 2012 COA 190, ¶ 39, 303 P.3d 131.

¶ 13 In an appeal from a judgment entered in a C.R.C.P. 106(a)(4) action, this court stands in the same position as the district court when conducting our review of the governmental body's action. *Giuliani*, ¶ 38, 303 P.3d 131; *Stevinson Imps., Inc. v. City & Cty. of Denver*, 143 P.3d 1099, 1101 (Colo. App.2006). We review the decision of the governmental body itself rather than the district court's decision regarding the governmental body's decision. *Bd. of Cty. Comm'rs v. O'Dell*, 920 P.2d 48, 50 (Colo.1996).

¶ 14 A reviewing court "must uphold the decision of the governmental body 'unless

there is no competent evidence in the record to support it.'" *Id.* (quoting *Sellon v. City of Manitou Springs*, 745 P.2d 229, 235 (Colo. 1987)). There is "no competent evidence" in the record if "the governmental body's decision is 'so devoid of evidentiary support that it can only be explained as an arbitrary and capricious exercise of authority.'" *Id.* (quoting *Ross v. Fire & Police Pension Ass'n*, 713 P.2d 1304, 1309 (Colo.1986)).

¶ 15 Furthermore, in determining whether the governmental agency abused its discretion or exceeded its jurisdiction, the reviewing court in a C.R.C.P. 106(a)(4) proceeding considers whether the governmental body misconstrued or misapplied the law. *See Giuliani*, ¶ 39, 303 P.3d 131. In doing so, the reviewing court reviews questions of law, such as the interpretation of a statute, de novo. *Stevinson*, 143 P.3d at 1101.

¶ 16 A reviewing court should defer to the governmental body's construction of its statute, and if there is a reasonable basis for the governmental body's interpretation of the law, the reviewing court may not set aside the governmental body's decision. *Giuliani*, ¶ 40, 303 P.3d 131. Nonetheless, when a governmental body's interpretation is not uniform or consistent, we do not extend deference and instead look to other statutory construction aids. *Canyon Area Residents for the Env't v. Bd. of Cty. Comm'rs*, 172 P.3d 905, 910 (Colo.App.2006).

¶ 17 If possible, courts must harmonize potentially conflicting statutory provisions. *Id.* Additionally, if there is a conflict, specific provisions prevail over general provisions, "unless the seemingly conflicting provisions may be construed to give effect to both." *Bd. of Cty. Comm'rs v. Bainbridge, Inc.*, 929 P.2d 691, 698 (Colo.1996).

## III. Applicable Land Use Planning and Regulation Law

¶ 18 While planning for the use of land and regulating land use are related, the Colorado regulatory scheme distinguishes between the two functions. *See Theobald v. Bd. of Cty. Comm'rs*, 644 P.2d 942, 948 (Colo. 1982). Pursuant to section 30–28–106(1), a county planning commission must make and

adopt a master plan for the development of an unincorporated territory of a county. The master plan "is the planning commission's recommendation of the most desirable use of land." *Theobald*, 644 P.2d at 948. Unlike binding regulations, a master plan "is a guide to development rather than an instrument to control land use." *Id.* A master plan is "only one source of comprehensive planning, and is generally held to be advisory only." *Id.* at 949.

¶ 19 On the other hand, it is the task of the legislative body charged with zoning—here, the Board—"to individually apply the broad planning policies to specific property, consistent with the public interest, and with notions of due process and equal protection." *Id.* at 948–49. Because master plans are generally advisory, a board of county commissioners, by majority vote, is specifically empowered to overrule a recommendation of the planning commission. *Id.* at 949; *see* § 30–28–110(1)(b), C.R.S.2015.

¶ 20 However, the law is also clear in Colorado that master plans may become binding if they are properly incorporated into a county's legislatively adopted subdivision, zoning, or other similar land development regulations. *See* § 30–28–106(3)(a); *Bd. of Cty. Comm'rs v. Conder*, 927 P.2d 1339, 1346 (Colo.1996).

¶ 21 In *Conder*, the Colorado Supreme Court held that a master plan may become regulatory, and therefore binding, by: "(1) formal inclusion of sufficiently specific master plan provisions in a duly-adopted land use regulation by a board of county commissioners or (2) a statutory directive from the General Assembly that landowners must comply with master plan provisions in pursuing land use development proposals." 927 P.2d at 1346.

¶ 22 The *Conder* court concluded that, in adopting Larimer County's subdivision regulations, the Board of County Commissioners of Larimer County had included a master plan compliance requirement. *Id.* The foreword to Larimer County's subdivision regulations called for consideration of the county's master plan provisions, and several sections in the regulations "require[d] that master plan provisions serve as 'guidelines' for development proposals." *Id.* The court held that these references in Larimer County's subdivision regulations to the county's master plan constituted "a legislative basis for the County's evaluation of subdivision proposals for compliance with master plan provisions." *Id.* at 1347.

¶ 23 Similarly, in *Canyon Area*, 172 P.3d at 910, a division of this court considered whether the Jefferson County Board of County Commissioners was required to make a finding that a proposed planned unit development (PUD) was compatible with the county's master plan or comprehensive plan before approving a PUD application. The division looked to section 24–67–104(1)(f), C.R.S.2015, of the Planned Unit Development Act of 1972, which explicitly states that a county or municipality must find that a PUD is in general conformity with any master plan or comprehensive plan for the county or municipality before approving a PUD application. *Canyon Area*, 172 P.3d at 910. Additionally, Jefferson County zoning resolution section 15.F.2.a(1) provided that the county's Planning Commission and Board of County Commissioners "shall consider" many factors when reviewing proposals, including "the compatibility of the proposal with existing and allowed land uses in the surrounding area" and the county's comprehensive plan, but the Jefferson County Board had "sole discretion to determine what weight, if any, to give each of [the] factors." *Id.* (emphasis omitted) (citation omitted).

¶ 24 Because section 24–67–104(1)(f) is a "statutory directive ... that landowners must comply with master plan provisions in pursuing land use development proposals," *Conder*, 927 P.2d at 1346, the division concluded that master plans are not advisory in the PUD context. *Canyon Area*, 172 P.3d at 911. Despite the language contained in the county's zoning resolution section 15.F.2.a(1), the division further concluded that the Jefferson County Board had to do more than just "consider" a PUD application's compliance with any master plan; the division held that section 24–67–104(1)(f) required the Jefferson County Board to find that the PUD

was in general conformity with any master plan or comprehensive plan. *Id.*

¶ 25 In 2007, in response to *Conder* and *Canyon Area*, the General Assembly amended section 30–28–106 to incorporate the basic holding in *Conder* that master plans may be made binding by formal inclusion in all types of county land use regulations. *See* Ch. 165, sec. 1, § 30–28–106(3)(a), 2007 Colo. Sess. Laws 612. Section 30–28–106 now provides, as relevant here:

> (1) It is the duty of a county planning commission to make and adopt a master plan for the physical development of the unincorporated territory of the county....
>
> ....
>
> (3)(a) ... The master plan of a county or region shall be an advisory document to guide land development decisions; however, the plan or any part thereof may be made binding by inclusion in the county's or region's adopted subdivision, zoning, platting, planned unit development, or other similar land development regulations after satisfying notice, due process, and hearing requirements for legislative or quasi-judicial processes as appropriate.

## IV. El Paso County Land Use Framework

¶ 26 The central legal issue in this appeal is whether the Board properly concluded that El Paso County's master plan retained its status as an advisory document because it had not been properly included and adopted as a mandatory regulatory document in El Paso County's Land Development Code. In order to fully analyze that issue, we first set out in some detail the pertinent provisions of El Paso County's land use and regulatory framework.

### A. Land Development Code

¶ 27 The pertinent and current version of El Paso County's Land Development Code was adopted by the Board through a public hearing process on October 12, 2006. The Land Development Code is the governing authority for "the development of buildings, structures and uses of land throughout unincorporated El Paso County." Land Dev. Code § 1.3.

¶ 28 It states that the Board "is the ultimate interpreter of the meaning and application of [the] Code as to the type, nature and rights of uses, conforming and nonconforming, as allowed under this Code." *Id.* § 2.2.1(H). In addition, the Land Development Code grants authority to the Board to approve, approve with conditions, or deny special use permits. *Id.* § 2.2.1(B).

¶ 29 As previously mentioned, the Land Development Code states that "[t]he RR–5 zoning district is a 5 acre district intended to accommodate low-density, rural, single-family residential development." *Id.* § 3.2.2(A). Land Development Code Table 5–1 illustrates that a special use permit is required in order to build a greenhouse greater than one acre in size in the RR–5 zoning district. The Land Development Code includes the following definition:

> Use, Special
>
> A use that, owing to some special characteristics attendant to its operation or installation (e.g. potential danger, traffic, smoke or noise impact), is allowed in a zoning district, subject to approval and special requirements, different from those usual requirements for the zoning district in which the special use may be located.

*Id.* § 1.15.

¶ 30 Section 5.3.2 addresses the special use process and sets out the standards governing the Board's review of special use applications. Pursuant to section 5.3.2(B)(2),

> In approving a special use, the following findings *shall* be made:
>
> - *The special use is consistent with the applicable Master Plan;*
> - The special use is consistent with the intent and purposes of the zoning district where the use is proposed to be located or conforms to the approved development plan;
> - The special use will be in harmony with the character of the neighborhood, and compatible with the existing and allowable land uses in the surrounding area;
> - The special use will not result in an over-intensive use of land;

- The impact of the special use does not overburden or exceed the capacity of public facilities and services or, in the alternative, the special use application demonstrates that it will provide adequate public facilities in a timely and efficient manner;

- The special use will not create undue traffic congestion or traffic hazards in the surrounding area, and has adequate, legal access;

- The special use will not cause significant air, water, light, or noise pollution;

- The special use will not be otherwise detrimental to the public health, safety and welfare of the present or future residents of El Paso County; *and*

- The special use conforms or will conform to all other applicable County rules, regulations or ordinances.

(Emphasis added.) The word "shall" means "[t]he specified criteria are mandatory," and the word " '[a]nd' indicates that all connected items or provisions apply." Land Dev. Code §§ 1.14.3, 1.14.5, 1.15.

¶ 31 Furthermore, Appendix A to the Land Development Code contains a list of reference documents and regulations. Section A.1.2, titled "Applicability," states:

Inclusion within this Appendix does not constitute adoption of the referenced documents and regulations, where not otherwise formally adopted by El Paso County, but acknowledges the ability to utilize the information contained in those documents in the evaluation of development applications, building permit authorization, and other actions as provided for in this Code.

Land Dev. Code app. § A.1.2. Under the subtitle "El Paso County Regulatory Documents," the Appendix lists the Land Development Code, among other documents. *Id.* § A.1.6(A). Under a separate subtitle, "El Paso County Advisory Documents," the Appendix lists, among other documents: (1) the Master Plan for the Physical Development of El Paso County; (2) the Policy Plan; and (3) multiple SAPs, including the BFPP. *Id.* § A.1.6(B).

**B. El Paso County Master Plan**

¶ 32 The El Paso master plan is comprised of multiple documents, including the Policy Plan and ten SAPs. The Policy Plan functions as the overall policy element of the County's master plan and establishes broad goals and policies which are intended to provide a framework for overall decision-making regarding the development of the County. *See* El Paso Cty. Policy Plan, Mission Statement. The SAPs, on the other hand, "specifically articulate proposed land uses and relationships on a sub-regional scale by addressing the unique conditions and circumstances of each defined sub-area." Policy Plan ch. 1–B, Policy 1.1.2. In the event there is a conflict between the County-wide Policy Plan and a SAP concerning site-specific land use compatibility, deference is given to the pertinent SAP. *Id.* Policy 1.1.3. The BFPP, adopted by the County in 1987, is the pertinent SAP that addresses land use in the Black Forest area.

**1. El Paso County Policy Plan**

¶ 33 Chapter 1–A of the Policy Plan defines its purpose and intent. Contained in this chapter is the following provision:

*Function*

The primary purpose of this document is to function as the overall policy element of the county master plan. It should be relied on by the Planning Commission and the Board of County Commissioners for guidance, direction and expectations concerning broader land use planning issues.... A secondary purpose of this Plan is to provide a framework to tie together the more detailed sub-area and topical elements of the Master Plan....

This Policy Plan is also meant to address topics which can be best approached from a regional perspective. To a degree, this Policy Plan provides a balance to the Small Area Plans which may not fully address issues either through oversight or because they are locally controversial.

Policy Plan ch. 1–A. Under the subsection titled "Legal Authority," the Policy Plan states:

Pursuant to state statute (C.R.S. 30–28–101 et. [sic] seq.), it is the duty of the County Planning Commission to make and adopt a master plan for the unincorporated County. While the statutes clearly recognize the essential role of the master plan, it is considered advisory and not legally binding upon the land use decisions of the County.

*Id.*

¶ 34 Additionally, under the title "How the Plan Should be Used," the Policy Plan contains the following provisions:

*Relationship to Other Plan Elements*

As articulated in Section 1.0, this document is meant to be used in conjunction with the County's Small Area Plans and topical elements. They should be relied upon for specific land use guidance or detailed direction within the context of the subjects they address. This Policy Plan should be used for broader guidance, to ensure equity and consistency across the County and as a source of direction in those cases where it is not found in other Plan elements. In some cases, there will be a challenge involved in reconciling the community-wide planning expectations included in this document with the more locally focused but equally important perspectives contained in the Small Area Plans.

*Holistic Application*

The applicable policies in this document should be considered and applied comprehensively rather than singularly. Most development proposals will naturally be consistent with some policies while inconsistent with others. The appropriate approach is to evaluate all of the relevant policies and then make a land use decision with respect to overall consistency based upon a preponderance of the policies within this Policy Plan. It is not the intent of this plan to prescribe a hierarchy of policy statements. Rather, the significance of particular goals and policies derives from their utilization as part of the land use decision-making process and their applica-tion to specific land use proposals and issues.

*Id.*

¶ 35 Chapter 1–B in the Policy Plan contains multiple policies which explain the role of SAPs and how the SAPs and the Policy Plan interrelate. The following policies are pertinent here:

*Policy 1.1.1*

The relationship between the County-wide Policy Plan and the SAP's [sic] should be one of mutual support and interdependence.

*Policy 1.1.2*

The purpose of the SAP's [sic] should be to more specifically articulate proposed land uses and relationships on a sub-regional scale by addressing the unique conditions and circumstances of each defined sub-area in cooperation with the area representatives.

*Policy 1.1.3*

In the event of a possible conflict between the County-wide Policy Plan and a Small Area element, deference should be given to the pertinent SAP with respect to site-specific land use compatibility. The Policy Plan controls with respect to regional land use and infrastructure policy.

Policy Plan ch. 1–B.

2. Black Forest Preservation Plan

¶ 36 The introduction to the BFPP describes how the BFPP is divided into chapters, and it states that the chapter entitled "The Plan" is the "primary operational portion of this document." BFPP at 1. The introduction also states that the BFPP "is an advisory rather than a regulatory planning tool." *Id.*

¶ 37 Within the chapter entitled "The Plan" is a section that includes multiple goal statements and policies. This section includes the following goal statements and policies for "Growth and Land Use":

Goal Statements:

1.A—Preserve and enhance the sensitive natural environment and unique community character of the Black Forest Planning Area.

1.B—Uphold the adopted Land Use Scenario [4] and Concept Plan [5] which identifies areas to be used for agricultural and range lands, low and higher density residential development, commercial and industrial uses....

Policies:

1.1—Retain the Black Forest Planning Area as primarily a rural-residential community with limited supporting commercial and industrial development.

1.2—Allow nodes of higher density residential, commercial and industrial development only in those areas specifically designated on the Concept Plan and described in the Land Use Scenario.

1.3—Promote and plan a system of buffers around the Timbered Area, other planning units designated for low densities, and existing rural-residential subdivisions....

. . . .

1.6—Allow "low impact uses" as defined in this Chapter in areas designated for rural residential uses either through the Special Use review process or as part of carefully defined planned unit developments. Variances for low impact uses should be used sparingly and in all cases approvals should not result in a deviation from the predominantly rural-residential character of these areas.

*Id.* at 76–77. According to the BFPP, a "low impact use" is "[a] use which, due to its low intensity, limited scale and predominately rural character could be incorporated into an area otherwise designated for rural residential uses without significantly altering the character of that area." *Id.* at 72.

¶ 38 With respect to commercial activities within the Black Forest area, the BFPP contains the following goal statements and policies in the chapter entitled "The Plan":

4. Commercial

Goal

4.A Allow for limited commercial development which supports and enhances the Black Forest Planning Area.

Policies

4.1—Restrict new commercial uses within the forested and low density residential areas to existing or proposed commercial nodes as defined in the approved Land Use Scenario and Concept Plan. Within these areas infill should be encouraged rather than expansion....

. . . .

4.3—Limit commercial activities within the forested and low density residential planning units to those which accommodate the needs of local residents....

4.4—Maintain the scale of new commercial uses so that it is in balance with existing uses.

4.5—Discourage commercial uses if they are incompatible with existing or planned residential development.

4.6—Encourage all new commercial development within the planning area to be compatible with the visual character of existing uses....

*Id.* at 80.

¶ 39 Also included in the chapter entitled "The Plan" is the Land Use Scenario, which is meant to complement and further describe the goals, policies, and proposed actions of the BFPP. *Id.* at 89. It contains descriptions and development goals for ten individual sub-areas of the Black Forest area, one of which is the Timbered Area. *Id.* The Land Use Scenario states that uses in the Timbered Area "will be limited to low density residential or open space with the exception of the 'community center' at the intersection of Shoup and Black Forest Roads and the commercial node at the intersection of Burgess and Black Forest Roads." *Id.* at 89, 91. Further, "[t]he community and commercial centers should not significantly expand in area," and "[n]ew commercial and community uses within these centers should be contigu-

---

4. The "Land Use Scenario" in the BFPP is meant to complement and further describe the goals, policies, and proposed actions of the BFPP. It contains descriptions and development goals for ten individual sub-areas of the Black Forest area, one of which is the Timbered Area. BFPP at 89.

5. The "Concept Plan," which is pictured in Figure 1, page 4 of the BFPP, illustrates the steps that were involved in the development of the BFPP, and the cycle that should continue in order to keep the BFPP updated.

ous to existing uses and should be of a scale and character which are consistent with the existing pattern of development and with current zoning." *Id.* at 91.

## V. Analysis

¶ 40 Plaintiffs contend the Board abused its discretion because it approved BFM's special use application based on an erroneous legal standard, namely, the belief that the requirements of the BFPP were merely advisory, rather than binding, for its decision. They further contend that because of the provisions in the BFPP that stress preservation of the residential character of the Black Forest and restriction of additional commercial development in the Timbered Area, the Board's express finding that BFM's "special use is consistent with the applicable Master Plan" is unsupported by competent evidence.[6] Land Dev. Code § 5.3.2(B)(2). We disagree with these contentions and conclude the Board's decision was not an abuse of its discretion.

### A. Advisory Nature of El Paso County's Master Plan

■ ¶ 41 Because section 5.3.2(B)(2) of the Land Development Code expressly requires the Board to find that a "special use is consistent with the applicable Master Plan" before approving a special use application, plaintiffs contend the master plan is incorporated into the binding Land Development Code, and thus, the master plan is not solely an advisory document. *See* § 30–28–106(3)(a); *Conder,* 927 P.2d at 1346; *Theobald,* 644 P.2d at 949. Plaintiffs argue that the facts here are similar to the facts in *Conder* and *Canyon Area,* where the courts held that reference to a county's master plan in subdivision and zoning regulations constituted a binding master plan compliance requirement. *Conder,* 927 P.2d at 1346–47; *Canyon Area,* 172 P.3d at 911. We are not persuaded by plaintiffs' argument that those cases compel the same conclusion here. Rather, based on our de novo review of El Paso County's land use regulatory scheme as

a whole and harmonizing its various parts, *Canyon Area,* 172 P.3d at 910, we conclude that—notwithstanding the findings required by section 5.3.2(B)(2) of the Land Development Code—El Paso County has clearly demonstrated its intent that its master plan remain advisory and that the Board maintain its considerable discretion in deciding how to apply the master plan in its decisions on special use applications.

¶ 42 We begin our analysis by noting that many provisions in the Policy Plan and the BFPP contain language illustrating the County's clear intention that these plans remain advisory documents. For example, the BFPP explicitly states that it "is an advisory rather than a regulatory planning tool." BFPP at 1. Similarly, the Policy Plan states that its primary purpose is to serve as an "overall policy element" of the County's master plan; that it should be relied upon by the Board for "guidance"; and, importantly, that "[w]hile the statutes clearly recognize the essential role of the master plan, it is considered advisory and not legally binding upon the land use decisions of the County." Policy Plan ch. 1–A. The Policy Plan also states in the subsection titled "Relationship to Other Plan Elements" that it "should be used for broader guidance." *Id.*

¶ 43 Furthermore, the "Holistic Application" subsection in the Policy Plan explicitly states that "[t]he applicable policies in this document should be considered and applied comprehensively rather than singularly," and that "[i]t is not the intent of this plan to prescribe a hierarchy of policy statements." *Id.* The "Holistic Application" subsection also contemplates that many development proposals will be consistent with some policies while inconsistent with others, and it states that when these conflicts arise, the Board will have to balance all relevant policies to make its land use decisions "with respect to overall consistency based upon a preponderance of the policies within this Policy Plan." *Id.* These provisions demonstrate that the Board has broad discretion when making land use decisions, and that the Policy Plan and BFPP

---

6. The Board did make written findings in Resolution no. 14–107 that all of the required findings for approval of a special use application in sec-

tion 5.3.2(B)(2) were satisfied, but it did not provide written analysis or explanations for its findings in its Resolution.

are meant to serve as advisory, not binding, documents to guide the Board's decisions.

¶ 44 Plaintiffs do not dispute that the Policy Plan and BFPP describe themselves as advisory documents and grant the Board broad discretion. However, they argue that such "advisory" language in the master plan documents is essentially meaningless because, as a matter of law, all planning documents are initially advisory. Rather, plaintiffs contend that the County's master plan lost its advisory status by incorporation in the Land Development Code. *See* § 30–28–106(3)(a). Specifically, plaintiffs point to the reference in section 5.3.2(B)(2) of the Land Development Code requiring the Board to find, in addition to other findings, that a special use "is consistent with the applicable Master Plan" before approving a special use application. Plaintiffs contend that this reference is effectively the same as the provisions considered in *Conder* and *Canyon Area*. *See Conder*, 927 P.2d at 1346; *Canyon Area*, 172 P.3d at 910–11.

¶ 45 We disagree because the plain language of the Land Development Code refutes plaintiffs' contention. Unlike the regulatory frameworks at issue in *Conder* and *Canyon Area*, El Paso County's Land Development Code was legislatively adopted with provisions expressly stating that the County's master plan, including the Policy Plan and BFPP, is made up of advisory documents. As described above, the Land Development Code lists itself under the title "El Paso County Regulatory Documents." Land Dev. Code app. § A.1.6(A). However, it separately lists the Master Plan for the Physical Development of El Paso County, the Policy Plan, and the BFPP under the title "El Paso County Advisory Documents." *Id.* § A.1.6(B). Significantly, the Land Development Code also states that

[i]nclusion within this Appendix does not constitute adoption of the referenced documents and regulations, where not otherwise formally adopted by El Paso County, but acknowledges the ability to utilize the

information contained in those documents in the evaluation of development applications, building permit authorization, and other actions as provided for in this Code.

*Id.* § A.1.2. Plaintiffs do not point to, nor have we found, any provisions in the Land Development Code that negate these clear and express statements of the County's intent to maintain the advisory nature of the County's planning documents.

¶ 46 The Land Development Code also contains provisions demonstrating the County's intent that the Board maintain wide discretion when making land use decisions. Specifically, it grants authority to the Board to approve, approve with conditions, or deny special use permits, and it states that the Board "is the ultimate interpreter of the meaning and application of [the] Code as to the type, nature and rights of uses." Land Dev. Code §§ 2.2.1(B), 2.2.1(H).

¶ 47 Furthermore, section 30–28–106(3)(a) itself provides that a master plan *"may* be made binding by inclusion in the county's or region's adopted subdivision, zoning, ... or other similar land development regulations." (Emphasis added.) The statute does not state that including a reference to a master plan in a county's land development regulations *necessarily* makes the master plan binding in all respects. Rather, *Webster's Third New International Dictionary* 1396 (2002) defines "may" as "have the ability to," "have permission to," or "used to indicate possibility or probability." [7] Thus, considering: (1) the discretionary language contained in section 3028–106(3)(a); (2) the explicit provisions in the Land Development Code listing the Policy Plan and BFPP as advisory documents; (3) the provisions in the Land Development Code granting the Board wide discretion to make land use decisions; (4) the many provisions in the Policy Plan stating that it should be used for guidance; and (5) the provisions in both the Policy Plan and BFPP stating that they are advisory documents, we conclude that, although the Board

---

**7.** Section 30–28–106, C.R.S.2015 does not define "may." Where a term is not defined in a statute and "the word at issue is a term of common usage, and people of ordinary intelligence need not guess as its meaning, we may refer to dictio-

nary definitions in determining the plain and ordinary meaning of the word." *Mendoza v. Pioneer Gen. Ins. Co.*, 2014 COA 29, ¶ 24, 365 P.3d 371.

was required to make a finding that BCM's special use was consistent with the applicable master plan, the County reserved wide discretion for the Board in making that finding and explicitly adopted the Land Development Code with the intention that the County's master plan remain advisory. *Canyon Area,* 172 P.3d at 910. Consequently, we reject plaintiffs' argument that the Board approved BFM's special use application based on an erroneous legal standard. To the contrary, we conclude there is a reasonable basis for the Board's interpretation of its own regulatory framework and, thus, we must defer to that interpretation. *Giuliani,* ¶ 40, 303 P.3d 131.

### B. Competent Evidence in the Record Supports the Board's Decision

¶ 48 We next consider whether there is competent evidence in the record supporting the Board's finding that BFM's special use application "is consistent with the applicable Master Plan." Land Dev. Code, § 5.3.2(B)(2);[8] *see O'Dell,* 920 P.2d at 50.

¶ 49 As an initial matter, plaintiffs contend that the phrase "applicable Master Plan" refers only to the BFPP. Plaintiffs rely on Policy 1.1.3 in the Policy Plan, which states that deference should be given to the pertinent SAP with respect to site-specific land use compatibility when there is a conflict between the Policy Plan and a SAP. The BFPP specifically governs land use in the Black Forest area and contains provisions restricting commercial development beyond the Timbered Area's community center and current commercial node. Thus, plaintiffs contend that the BFPP is the controlling master plan document here and that there is no competent evidence in the record that BFM's special use application is "consistent" with the BFPP. We disagree.

¶ 50 As discussed above, in construing the land use and regulatory framework as a whole, we must "harmonize potentially conflicting ... provisions," *Canyon Area,* 172 P.3d at 910, and specific provisions prevail over general provisions "unless the seeming-

8. Plaintiffs do not challenge the Board's other findings required under section 5.3.2(B)(2), and

ly conflicting provisions may be construed to give effect to both," *Bainbridge,* 929 P.2d at 698. Here, the Policy Plan states that the relationship between the Policy Plan and SAPs "should be one of mutual support and interdependence." Policy Plan ch. 1–B, Policy 1.1.1. Furthermore, the Policy Plan states that it serves as the "overall policy element of the county master plan," and that it "provides a balance to the Small Area Plans which may not fully address issues either through oversight or because they are locally controversial." Policy Plan ch. 1–A. The Policy Plan also states that "this document is meant to be used in conjunction with the County's Small Area Plans and topical elements." *Id.* Thus, in order for the Policy Plan and BFPP to provide "mutual support" and to be "used in conjunction" with one another, the Board looks to *both* the Policy Plan and pertinent SAP when making its land use decisions (the Policy Plan for broader guidance and the SAPs for specific land use guidance). Therefore, we conclude that the reference to the "applicable Master Plan" in section 5.3.2(B)(2) of the Land Development Code refers to *both* the Policy Plan and the BFPP, and that any "seemingly conflicting provisions may be construed to give effect to both." *Bainbridge,* 929 P.2d at 698.

¶ 51 Here, the record shows that at the March 18 hearing before the Board, many individuals presented testimony and documentary evidence both for and against approval of BFM's special use application. The following is a sampling of evidence in the record supporting the Board's finding that BFM's special use is consistent with the master plan:

- A member of the Planning Commission presented evidence that the BFPP allows "low impact uses" through the special use process as long as approval does "not result in a deviation from the predominantly rural-residential character[;]"

- the Policy Plan encourages appropriate economic development in rural areas that is compatible with existing land uses;

thus, we need not address them.

- the Policy Plan encourages reasonable accommodation of mixed uses within neighborhoods;

- the County's Planning Commission recommended to the Board that BFM's greenhouse proposal was "generally consistent with the [P]olicy [P]lan ... the overarching—guidance[;]"

- a BFM representative argued that BFM's special use was consistent with the master plan's goals of protecting and supporting rural and agricultural operations, encouraging economic development, and reasonably accommodating special uses which provide value to the greater community;

- the BFM representative focused his testimony on the "Holistic Application" section of the Policy Plan, stating: "Holistically we meet the preponderance of ... the requirements for a special use. We are accurately and economically developing in the area. We are not creating any type of undue concern for health or public welfare. We are providing for the community as a whole."

¶ 52 In addition to the evidence presented at the hearing, the Board also properly considered legal advice from the El Paso County Attorney. The County Attorney advised the Board that there were a number of different elements to the County's master plan, including the "broader policy plan" and "the more specific Black Forest Preservation Plan." The County Attorney advised the Board that if, on the one hand, it was inclined to approve BFM's special use permit application, it could consider the application's consistency with the broader elements of the Policy Plan. He noted that Policy 1.1 in the BFPP expresses a policy to retain the Black Forest as *primarily*, not exclusively, a residential community; he also noted that various provisions in the BFPP state that commercial development which supports and enhances the Black Forest planning area should be allowed. On the other hand, the County Attorney also advised the Board that if it was inclined to deny BFM's special use application, it could rely instead on the "very focused piece of the plan ... [addressing] the [T]imbered [A]rea

subarea." This advice was entirely consistent with the broad discretion granted to the Board in the Land Development Code provisions discussed above.

¶ 53 Following the County Attorney's legal advice, one commissioner made a motion to deny BFM's application, believing it was not consistent with the BFPP. Another commissioner seconded that motion. However, three other commissioners voted to approve BFM's special use permit application and provided various reasons for approval, including that the County's master plan was advisory, BFM's special use was consistent with the master plan in many different ways (including some of those outlined above), and BFM's application complied with the County's Policy Plan and broader provisions in the BFPP.

¶ 54 Thus, we conclude that the Board's finding that BFM's special use application was "consistent with the applicable Master Plan" was supported by competent evidence. Because the County's master plan, which included both the Policy Plan and the BFPP, was advisory, we cannot say that the Board was required to find that the special use was consistent with each and every provision in the BFPP and Policy Plan to approve the special use application. Rather, the Board was free to exercise its discretion, and to apply a more holistic approach, when finding that BFM's special use application was "consistent with the applicable Master Plan." Land. Dev. Code § 5.3.2(B)(2).

¶ 55 Accordingly, reviewing all of the evidence presented to the Board along with the provisions of the Policy Plan and BFPP, we cannot say that the Board's finding that BFM's application was "consistent with the applicable Master Plan," id. was "so devoid of evidentiary support that it can only be explained as an arbitrary and capricious exercise of authority." *O'Dell*, 920 P.2d at 50 (quoting *Ross*, 713 P.2d at 1309).

## VI. Conclusion

¶ 56 The judgment is affirmed.

Márquez * and Vogt*, JJ., concur